UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EDWARD NIEDZIEJKO,

                              Plaintiff,

v.                                                                    1:18-CV-0675
                                                                      (GTS/CFH)
DELAWARE & HUDSON RY. CO., INC.,
d/b/a Canadian Pac. Ry.,

                              Defendant,
_____

APPEARANCES:                                          OF COUNSEL:

JERRY MARTILLOTTI & ASSOCIATES, PC          GERARD J. MARTILLOTTI, ESQ.
   Counsel for Plaintiff
4221 Ridge Avenue, P.O. Box 18509
Philadelphia, Pennsylvania 19129

BOND, SCHOENECK & KING, PLLC                MICHAEL D. BILLOK, LLP
   Counsel for Defendant
22 Corporate Woods Boulevard, Suite 501
Albany, New York 12211

STINSON LEONARD STREET LLP                  TRACEY H. DONESKY, ESQ.
   Co-Counsel for Defendant                 NICOLE FAULKNER, ESQ.
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this Federal Railway Safety Act action filed by Edward

Niedziejko ("Plaintiff") against Delaware & Hudson Railway Company, Inc. ("Defendant"), is

Defendant's motion to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and

12(b)(6) or, in the alternative, motion for summary judgment pursuant to Fed. R. Civ. P. 56.

(Dkt. No. 12.)  For the reasons set forth below, Defendant's motion is granted.

# TABLE OF CONTENTS

**I.  RELEVANT BACKGROUND** .......................................................................**2**

    **A.  Plaintiff's Complaint** .............................................................**2**

    **B.  Statement of Undisputed Material Facts** .....................................**4**

    **C.  Parties' Briefing on Defendant's Motion** ..................................**47**

        **1.  Defendant's Memorandum of Law** ....................................**47**

        **2.  Plaintiff's Opposition Memorandum of Law** .....................**50**

        **3.  Defendant's Reply Memorandum of Law** ..........................**52**

**II.  GOVERNING LEGAL STANDARDS** ...............................................**54**

    **A.  Standard Governing Motion to Dismiss for Lack of Subject-Matter Jurisdiction** ........................................................................**54**

    **B.  Standard Governing Motion to Dismiss for Failure to State a Claim** ....**54**

    **C.  Standard Governing Motion for Summary Judgment** ............................**58**

    **D.  Standard Governing Plaintiff's Claims and Defendant's Defenses** .......**61**

**III.  ANALYSIS** ........................................................................**61**

    **A.  Analysis of Plaintiff's Motion to Dismiss for Lack of Subject-Matter Jurisdiction** ........................................................................**61**

    **B.  Analysis of Plaintiff's Claim of Discriminatory Reprimand** ...................**67**

        **1.  Failure-to-State-a-Claim Analysis** ...................................**67**

        **2.  Summary-Judgment Analysis** ..........................................**68**

    **C.  Analysis of Plaintiff's Claim of Discriminatory Termination** .................**85**

        **1.  Failure-to-State-a-Claim Analysis** ...................................**85**

        **2.  Summary-Judgment Analysis** ..........................................**85**

# I.     RELEVANT BACKGROUND

## A.     Plaintiff's Complaint

Generally, liberally construed, Plaintiff's Complaint alleges as follows. (Dkt. No. 1.)

<u>Staffing Reduction</u>

Before late 2015, Plaintiff was hired as a Special Agent in Defendant's Police Department. (*Id.*) Starting in late 2015, the number of police officers available to staff Defendant's Police Department was reduced (due to Defendant's closure of a section of its Police Department in Taylor, Pennsylvania, as a result of a sale of part of Defendant's business in August of 2014). (*Id.*) Subsequently, in 2015 and 2016, this reduction was exacerbated by work injuries and retirements. (*Id.*) Because of these reductions, at any given time, there were three or fewer special agents or police officers available to staff Defendant's Police Department for the entire Eastern United States, including Upstate New York. (*Id.*) As a result, on several occasions, Plaintiff worked a full shift and then, either before returning home or a short time after arriving home, was required to return to work to respond to a call to work for an additional period lasting several hours. (*Id.*)

<u>Safety Complaints</u>

Starting on or about March 30, 2016, and continuing into June of 2016, Plaintiff complained to his supervisors, union representatives, and colleagues about safety issues resulting from the aforementioned reduction in staffing and requirement of excessive overtime. (*Id.*) More specifically, Plaintiff complained that being required to work for extended periods of time without adequate rest of days off posed safety issues to the Albany Police Unit of the Canadian Pacific Railway starting in the fall of 2015. (*Id.*) Plaintiff's fellow employees, including Michael Savokinas, joined in these complaints. (*Id.*) However, rather than take steps to resolve

Plaintiff's concerns, Plaintiff's supervisors made it known that any safety complaints would lead to trouble for the person making them. (*Id.*) Plaintiff responded by letting it be known that he was going to have Defendant's staffing policy evaluated by the Occupational Safety and Health Administration ("OSHA"). (*Id.*)

Review of Shotgun Logs

Immediately thereafter, Defendant initiated its first-ever review of the shotgun logs of its special agents, including Plaintiff, from October 1, 2015, through March 31, 2016. (*Id.*) Pursuant to Defendant's policy (which was put in place in 2009), shotgun logs were to be kept by all special agents who carried a shotgun, and were to be reviewed and signed by all supervisors. (*Id.*) Since 2013, Plaintiff had not filled out a shotgun log because he had not regularly carried a shotgun. (*Id.*) Defendant conducted an intensive investigation of Plaintiff in June of 2016, then brought disciplinary charges against him for (1) not logging out a shotgun in August 2015 (three months before the beginning of the audit period), and (2) violating the shotgun log policy in March 2016 based on the testimony of his supervisor (to whom Plaintiff had made a safety complaint). (*Id.*) No similar investigation was made against Defendant's other employees, despite the fact that Plaintiff's direct supervisor (Sergeant Seymour) himself was found to have not reviewed shotgun logs on a monthly basis as required by the policy. (*Id.*) After finding Plaintiff guilty of the disciplinary charges, Defendant reprimanded him. (*Id.*)

Call to Mechanicsville

On June 9, 2016, while on duty as a special agent working for Defendant, Plaintiff received a call from Defendant's dispatcher directing him to go Mechanicsville, New York, to investigate a report of teenage trespassers allegedly placing debris on the train tracks. (*Id.*) Plaintiff responded to the call, worked with local law enforcement, and checked the area for

more than an hour.  (*Id.*)  After determining that the area was clear, Plaintiff called the train crew on the radio and was informed that the train had passed the area without any issue.  (*Id.*)  As a result, Plaintiff closed the call and deemed the issue resolved.  (*Id.*) Shortly thereafter, Plaintiff's supervisor, Commander Szymaszek, inquired about the events in Mechanicsville, and Plaintiff advised him that the matter had been resolved without issue.  (*Id.*)

On June 19, 2016, Defendant brought a disciplinary charge against Plaintiff for deceit in his conversation with Commander Szymaszek based on the fact that Plaintiff had not responded to the actual location of the call.  (*Id.*)  After being informed of the charges, Plaintiff informed his supervisors that the dispatcher had sent him to the wrong location.  (*Id.*)  Plaintiff's supervisor listened to the dispatch tape and found that Plaintiff had indeed been sent to the wrong location.  (*Id.*)  However, Defendant did not provide this information to Plaintiff or his representatives.  (*Id.*)  Instead, after an investigation and hearing, Defendant terminated Plaintiff's employment.  (*Id.*)

<u>Claims</u>

Generally, based on these factual allegations, the Complaint asserts the following two claims: (1) a claim that Plaintiff was discriminatorily reprimanded for reporting, in good faith, a hazardous safety condition in violation of the Federal Railway and Safety Act, 49 U.S.C. § 20109(1)(A) ("FRSA"); and (2) a claim that Plaintiff was discriminatorily terminated for reporting, in good faith, a hazardous safety condition, also in violation of the FRSA.  (*Id.*)

**B.      Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendant in its Rule 7.1 Statement and not successfully denied by Plaintiff in a Rule 7.1 Response that both *matched* the paragraphs of Defendant's Rule 7.1 Statement and *specifically cited* the record

where the factual issue arises, as required by Local Rule 7.1(c) of the Local Rules of Practice for this Court. (*Compare* Dkt. No. 15 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 24 [Plf.'s Rule 7.1 Response].)

## The Parties

1.     The Delaware & Hudson Railway Company, Inc. d/b/a Canadian Pacific ("CP" or "D&H") is a Class I railroad providing freight rail transportation services in parts of the United States. On September 18, 2015, CP sold the southern portion of the D&H to another Class I Railroad, which covered 280 miles of Defendant's rail track and included operations in Pennsylvania. Since the fall of 2015, CP has operated only in New York.[1]

2.     To ensure and promote railway safety, Defendant has its own "CP Police Services" ("CPPS") railway law enforcement agency that works closely with communities, other law enforcement, and government agencies across the rails where it operates. CPPS's mission is to protect CP's employees, property and passengers, and the lading of its customers. CP operates 24 hours per day and 7 days per week.[2]

---

[1]     Defendant supports this factual assertion by citing an "declaration" that was neither signed before a notary public nor sworn pursuant to 28 U.S.C. § 1746. (Dkt. No. 15, at ¶ 1.) As a result, the Court finds that this declaration (Dkt. No. 18, Attach. 31 [Szymaszek Decl.]) is inadmissible and will not be considered. However, this fact is supported by other admissible evidence in the record that the Court has come across and will not ignore. (Dkt. No. 18, Attach. 29, at 9.) In addition, Plaintiff has admitted this factual assertion. (Dkt. No. 24, at ¶ 1.)

[2]     Defendant supports this factual assertion by citing an exhibit attached to its attorney declaration which includes excerpts from the policies and procedures manual of 2013. (Dkt. No. 15, at ¶ 2.) Defendant's counsel does not purport to be the records keeper, and has not adduced a certification by that records keeper. (*See generally* Dkt. No. 18.) However, Plaintiff has admitted this fact. (Dkt. No. 24, at ¶ 2.) Indeed, Plaintiff has not contested the accuracy of this document and has testified that he recognizes the document and acknowledges that the policy would have applied to him. (Dkt. No. 18, Attach. 12, at 32 [attaching page "121" of transcript].) The Court notes that docket citations given in this Decision and Order are to the screen number shown on the docket, not the page number listed on the document.

3.      CPPS has police detachments in various locations in the U.S., which provide law enforcement services to multiple separate subsidiary entities, including the D&H and Soo Line Railroad Company.

4.      In addition to the detachment on the D&H, CPPS also has U.S. detachments located in the following locations: Detroit, Michigan; Bensenville, Illinois; and several other U.S. locations.

5.      The police detachment on the D&H is the only unionized detachment for which the terms and conditions of employment for its Special Agents, like Plaintiff, are governed by a Collective Bargaining Agreement (the "CBA").  The CBA is between the D&H and the Police Department employees represented by the Allied Services Division of the Transportation Communications International Union (the "Union").

6.      Plaintiff worked in law enforcement for Defendant as a Special Agent in the CPPS Northeast U.S. District (out of the "Albany Detachment").

7.      Plaintiff was employed by Defendant from June 2001 until September 2016.

8.      For approximately one-and-one-half years, Plaintiff worked part-time for the Ballston Spa Police Department while he was also employed with CP.  More specifically, he worked the midnight shift (11 p.m. to 7 a.m.) at the Ballston Spa Police Department on his days off from his CP schedule.

9.      The CPPS for the D&H was historically comprised of police detachments in the following locations: Taylor, Pennsylvania; Binghamton, New York; Oneonta, New York; Buffalo, New York; Albany, New York; and Clifton Park, New York.[3]

10.     During Plaintiff's employment, CP employed Special Agents Edward Niedziejko and REDACTION 1 in Albany, New York and two Special Agents, REDACTION 2 and REDACTION 3, in Taylor, Pennsylvania.[4]

11.     From around the time he started with CP until September 2015, Plaintiff and REDACTION 1 were the only two Special Agents in the Albany detachment.[5]

---

[3]     Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 9), the Court will deem this fact established because (1) it is partially supported by other admissible evidence in the record (Dkt. No. 18, Attach. 28, at 11; Dkt. No. 18, Attach. 29, at 8-9), (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 9), and (3) the fact is not highly material to this motion. *See, supra,* note 1 of this Decision and Order.

[4]     Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 10), the Court will deem this fact established because (1) it is supported by other admissible evidence in the record (Dkt. No. 18, Attach. 12, at 29; Dkt. No. 18, Attach. 29, at 9), and (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 10). *See, supra,* note 1 of this Decision and Order.

[5]     Plaintiff responds that this factual assertion is "[a]dmitted in part" and "[d]enied in part." (Dkt. No. 24, at ¶ 11.)  However, Plaintiff does not identify which part of the asserted fact is denied.  (*Id.*) This is improper in a Rule 7.1 Response.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or *denying each of the movant's assertions* in matching numbered paragraphs.") (emphasis added); *cf.* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . .").  Instead, Plaintiff asserts, "[b]y way of further answer," facts that attempt to either undermine Defendant's asserted fact or deny an implication of that asserted fact, both of which are also improper in a Rule 7.1 Response.  *See Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"); *Yetman v. Capital Dist. Transp. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July

12.     For approximately two years following the retirement of the then-manager of the Albany detachment until September 2015, Special Agent REDACTION 2 served as acting manager to oversee the day-to-day activities of the Pennsylvania and New York detachments on the D&H.  However, he remained a union employee during this time.

13.     Further, as noted above, REDACTION 2 worked out of the Pennsylvania detachment.  The Albany and Pennsylvania detachments ultimately reported to District Inspector Dennis Szymaszek, who worked out of Detroit, Michigan.[6]

**Defendant Sells the Southern Part of Its Rail Line,
Which Results in Less Territory to Cover and
the Albany Detachment Gaining an Additional Special Agent**

14.     In and around mid-November 2014, D&H announced it was selling the southern portion of its rail line to another Class I rail carrier, the Norfolk Southern ("NS").[7]

---

23, 2015) (Suddaby, J.) (citing authority for the point of law that summary judgment procedure involves the disputation of asserted facts not implied facts).  To the extent that a non-movant desires to set forth any additional material facts that he contends are in dispute, he is required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.  Granted, Defendant supports this fact by citing an inadmissible "declaration."  (Dkt. No. 15, at ¶ 11.)  *See also, supra,* note 1 of this Decision and Order.  However, this fact is supported by other admissible evidence in the record.  (Dkt. No. 18, Attach. 12, at 29.)

[6]     Although Defendant supports the second sentence of this asserted fact by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 13), the Court will deem this fact established because (1) it is supported by other admissible evidence in the record (Dkt. No. 18, Attach. 29, at 7-8), and (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 13).  *See, supra,* note 1 of this Decision and Order.

[7]     Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 14), the Court will deem this fact established because (1) the fact appears established elsewhere in the record (*see, e.g.,* Dkt. No. 18, Attach. 29, at 9), (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 14), and (3) the fact is not highly material to this motion. *See, supra,* note 1 of this Decision and Order.

15. After review and approval was obtained from the U.S. Surface Transportation Board on May 15, 2015, the sale was completed on September 18, 2015.[8]

16. At that time, REDACTION 2, out of the Pennsylvania detachment, left CP and took a position with Norfolk Southern ("NS"). The other Pennsylvania Special Agent, REDACTION 3, remained employed with CP, but moved to the Albany detachment following the sale.

17. Accordingly, as of mid-September 2015, CP increased its Special Agents in the Albany detachment from two to three agents.[9]

<u>Supervisory Structure Changes at the Albany Police Detachment</u>

18. Sergeant Seymour has been employed with CP since 2004.[10]

19. Sergeant Seymour worked as a Special Agent (then titled "Inspector") from 2004 through 2011, at which time he took a position in management as Senior Investigator in Charge (later titled "Sergeant").

20. Beginning in 2011, in his new role as Senior Investigator, he began supervising the police officers/Special Agents of the Detroit, Michigan, detachment. He works out of the

---

[8]     Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 15), the Court will deem this fact established because (1) the fact is consistent with the rest of the record (*see, e.g.,* Dkt. No. 18, Attach. 29, at 9), (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 15), and (3) the fact is not highly material to this motion. *See, supra,* note 1 of this Decision and Order.

[9]     Because of the conflict between Plaintiff's cited record evidence (which establishes that his "territory" used to be "much smaller") and Defendant's cited record evidence (which establishes that "the amount of rail left to patrol" decreased after the merger), the Court will deem the second sentence in Paragraph 17 of Defendant's Rule 7.1 Statement as controverted. (Dkt. No. 15, at ¶ 17; Dkt. No. 24, at ¶ 17.) The Court notes that Plaintiff has admitted the first sentence of Paragraph 17, which is established by the record.

[10]     While this asserted fact is not supported by the citation provided by Defendant (Dkt. No. 15, at ¶ 18), it is supported elsewhere in the record (Dkt. No. 18, Attach. 28, at 5).

Allen Park, Michigan, detachment office.[11]

21.　　In September 2015, Sergeant Seymour was given additional responsibility to temporarily supervise the Albany detachment.

22.　　In and around February 2016, Sergeant Seymour was permanently named as supervisor for the Albany detachment.  He remained in that position during the times relevant to this matter. Sergeant Seymour continued to reside, work, and supervise the Detroit detachment, but the Albany detachment was added to his supervisory responsibilities.

23.　　Because the Special Agents working out of the Detroit, Michigan, detachment are not unionized, this was Sergeant Seymour's first experience supervising unionized employees.[12]

24.　　Also around this time, Bobby Walker was hired as the new Deputy Chief following his predecessor's retirement.[13]

---

[11]　　Defendant supports this factual assertion by citing an "declaration" that was neither signed before a notary public nor sworn pursuant to 28 U.S.C. § 1746.  (Dkt. No. 15, at ¶ 20.) As a result, the Court finds that this declaration (Dkt. No. 18, Attach. 30 [Seymour Decl.]) is inadmissible and will not be considered.  However, the Court will deem this fact established because (1) the fact appears consistent with the rest of the record (*see, e.g.,* Dkt. No. 18, Attach. 28, at 6-7), (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 20), and (3) the fact is not highly material to this motion.

[12]　　Although this asserted fact is not supported by the citation provided by Defendant (Dkt. No. 15, at ¶ 23), it is supported elsewhere in the record (Dkt. No. 18, Attach. 28, at 33).  In addition, Plaintiff's inability to admit or deny this factual assertion does not constitute a denial. *See F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact."); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute.").

[13]　　Defendant supports this fact by citing to an "declaration" that was neither signed before a notary public nor sworn pursuant to 28 U.S.C. § 1746.  (Dkt. No. 15, at ¶ 24.)  *See, also supra,* note 1 of this Decision and Order.  However, the Court will deem this fact established because (1) it is supported elsewhere in the record (Dkt. No. 18, Attach. 29, at 12), and (2) Plaintiff has admitted it (Dkt. No. 24, at ¶ 24).

<u>Plaintiff's Unionized Employment with CP</u>

25.  Plaintiff began working for Defendant in its CPPS unit in 2001.

26.  He began his CP employment as a Special Agent and remained employed in this Unionized position at all times relevant to this matter.

27.  Before working for CP, Plaintiff worked in law enforcement as a police officer for the New York State Park Police and the Corinth Police Department.

28.  Plaintiff testified that, in his capacity as a police officer and Special Agent, he appreciated and understood the need to be truthful and credible.

29.  Plaintiff testified that his positions as a police officer and Special Agent involved testifying in a court of law, which he was familiar with and had done with regularity, including while employed at CP.

30.  Plaintiff worked as a Special Agent until his dismissal on September 9, 2016.[14]

<u>The Special Agent Position</u>

31.  Special Agent duties include handling of such law enforcement matters as emergency response, special events policing, risk reduction operations, investigation of criminal acts, crime prevention, and public safety programs.[15]

32.  Responsibilities of a CPPS Special Agent include criminal and collision investigations, emergency response to incidents and calls for service, protection of railway

---

[14]  Defendant supports this asserted fact by citing an exhibit attached to its attorney declaration. (Dkt. No. 15, at ¶ 30.) Defendant's counsel does not purport to be Defendant's records keeper, and has not adduced a certification by that records keeper. (*See generally* Dkt. No. 18.) However, the Court will deem this fact established because (1) the fact appears consistent with the rest of the record (*see, e.g.*, Dkt. No. 18, Attach. 12, at 39-40), (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 30), and (3) the fact does not appear highly material to this motion.

[15]  Defendant supports this asserted fact by citing to an exhibit attached to its attorney declaration that included the job description for the Special Agent position. (Dkt. No. 15, at ¶

assets, operations and personnel, and work with other law enforcement agencies during investigations and in joint enforcement operations. Further, Special Agents must (a) maintain good working knowledge of relevant legislation, policies and procedures, (b) effectively and efficiently plan, manage and prioritize workload and conduct general and directed patrols, (c) be prepared to travel on assignments, in response to incidents and for training, (d) possess strong communication skills, and (e) prepare comprehensive reports and prosecution files and deliver court testimony.[16]

33.     CPPS Special Agents for Defendant in New York, including Plaintiff, have arresting power and are authorized to carry a firearm as part of their position. During their service, a CP-issued handgun is personally assigned to each Special Agent; shotguns are located in the police detachment and, pursuant to company policy, are to be signed in and out by completing a shotgun user log.[17]

---

31.) Defendant's counsel does not purport to be Defendant's records keeper, and has not adduced a certification by that records keeper. (*See generally* Dkt. No. 18.) However, the Court will deem this fact established because (1) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 31), (2) the fact appears consistent with the rest of the record, and (3) indeed, he testified that the document relied upon by Defendant reflects an accurate description of the duties associated with his Special Agent position (Dkt. No. 18, Attach. 12, at 35).

[16]     In support of the second sentence of this asserted fact, which includes the bulleted list, Defendant cites the same exhibit as discussed above in note 15 of this Decision and Order. (Dkt. No. 15, at ¶ 32.) The Court will deem this portion of the asserted fact established for the same reasons as stated in note 15.

[17]     Although this asserted fact is not supported by the citation provided by Defendant (Dkt. No. 15, at ¶ 33), it is supported elsewhere in the record (*see, e.g.,* Dkt. No. 18, Attach. 12, at 34; Dkt. No. 18, Attach. 31, at ¶ 7; Dkt. No. 18, Attach. 15, at 11, 23-31, 35-44; Dkt. No. 18, Attach. 17, at 2-4). In addition, Plaintiff partly admits this fact. (Dkt. No. 24, at ¶ 33.) In partially denying this fact, Plaintiff states, "It is denied that the Defendant and some [of] its employees used shot gun [sic] logs. Plaintiff was specifically told by his prior Sargent [sic] that he did not have to fill out a shot-gun log in 2014." (Dkt. No. 24, at ¶ 33.) However, the above-stated fact (as modified by the record evidence) does not regard the *practice* of Defendant, or "some of its employees," regarding the shotgun logs. Nor does it regard what Plaintiff was told by his prior sergeant in 2014. *See Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law

34. As a Special Agent, Plaintiff would "protect the company's interest and minimize lawsuits against the company for people getting hurt on railroad property, trespasser accidents . . . [and] [t]heft from the railroad."

35. Communication between agents was an important aspect of being a Special Agent for CP.[18]

36. The Special Agent position is considered safety-sensitive.[19]

37. As a Special Agent for Defendant in New York, Plaintiff carried a firearm, and admits the importance of being honest and trustworthy. He also admits that the reports he prepared as a Special Agent were essential.

### The Union Collective Bargaining Agreement ("CBA")

38. A CBA governed the terms and conditions of Plaintiff's employment with CP.

---

that summary judgment procedure involves the disputation of asserted facts not implied facts). As a result, the Court will deem the above-stated fact uncontroverted.

[18]  The Court has modified the above-stated fact to accord with the cited record evidence, which establishes that Plaintiff believed that communication "through our com-center" was not an important aspect of his job as a Special Agent for C.P., because the com-center was "totally un–unreliable." (Dkt. No. 24, at ¶ 35; Dkt. No. 18, Attach. 2, at 34.)

[19]  Although Plaintiff denies this factual assertion in part, he does not specify the portion of the fact he is denying, nor does he cite record evidence that actually controverts the record evidence cited by Defendant. (Dkt. No. 24, at ¶ 36.) According to Defendant's cited record evidence, Plaintiff testified as follows:

> Q: The position of the special agent would be considered safety sensitive?
> A: You would think, right? That's in–
> Q: Well, you're carrying a handgun, right?
> A: Yeah, that's in contention right now. C.P. doesn't believe so.
> Q: You had–you carried a handgun with you?
> A: Yes.

(Dkt. No. 18, Attach. 12, at 34.) As a result, the Court will deem this fact uncontroverted.

39.     As a CPPS employee, Plaintiff was represented by the Union.  The Union and CP negotiated the terms and conditions of Plaintiff's employment as Special Agent pursuant to the CBA.

40.     One of the contractual provisions of the CBA provides Union employees, like Plaintiff, the right to a fair and impartial hearing before the imposition of any discipline.[20]

41.     The purpose of the formal hearing is to develop the facts regarding the incident and determine the employee's responsibility, if any, in connection with the incident.

42.     Union employees, like Plaintiff, can be represented at a formal investigation/hearing by a Union representative, and have the opportunity to present their cases through testimony, exhibits, witnesses, and cross-examination.

43.     The CBA also affords Union employees the opportunity to appeal any determination made pursuant to a formal investigation/hearing up to the highest designated officer of the company.

44.     If an employee is not satisfied with the outcome of his/her appeal, the CBA permits him/her to further appeal the decision to a federal arbitration panel under the Railway Labor Act ("RLA").

45.     Plaintiff exercised his right to appeal his dismissal.

46.     The CBA contains terms such as rates of pay, seniority, vacation, overtime, benefits and other terms as set forth in the contract.  For instance, Article 16 of the CBA addresses "Changing Assigned Starting Time and Rest Days," Article 21 addresses "Hours of

---

[20]     The Court has modified the above-stated fact to accord with the cited record evidence. Although Plaintiff disputes that he was indeed afforded a fair and impartial hearing (Dkt. No. 24, at ¶ 40), the fact stated above does not regard what Plaintiff was actually afforded. As a result, the Court will deem the above-stated fact uncontroverted.

Work," Article 23 addresses the "Work Week," and three separate Articles of the CBA (Articles 24, 25 and 26) are devoted exclusively to Overtime. More specifically, Article 24 outlines when and under what circumstances work will qualify as Overtime, Article 25 addresses "Absorbing Overtime," and Article 26 addresses "Authorizing Overtime." Further, Article 41 of the CBA addresses Health and Safety, stating, *inter alia*, that "[t]he health and safety of employees shall be protected. Employees will not be required to work under unsafe or unhealthy conditions."[21]

47.    If a dispute or issue arose in connection with terms of the CBA, the CBA had a procedure that governed how to grieve or resolve it.[22]

48.    Plaintiff received a copy of the CBA while employed at CP.

---

[21]    Plaintiff denies this factual assertion on the ground that his numerous specific complaints were repeatedly ignored. (Dkt. No. 24, at ¶ 46.) However, the factual assertion does not regard whether Plaintiff made complaints or they were ignored. As a result, this factual assertion will be deemed uncontroverted.

[22]    Although Plaintiff denies this factual assertion in part, he does not specify the portion of the fact he is denying, nor does he cite record evidence that actually controverts the record evidence cited by Defendant. (Dkt. No. 24, at ¶ 47.) According to Defendant's cited record evidence, Plaintiff testified as follows:

> Q:    And when there's a dispute or issue in connection with the terms
>        that are under the C.B.A. you have a procedure under the C.B.A.
>        that–that governs how to either grieve it or resolve it. Is that fair to
>        say?
> A:    Yes.

(Dkt. No. 18, Attach. 12, at 33.) Moreover, although Plaintiff cites exhibits to his Complaint, that pleading was not verified and thus is not admissible evidence on a motion for summary judgment. (Dkt. No. 1.) As a result, the Court deems this fact uncontroverted.

## Relevant CPPS Policies & Procedures Manual

49. The CPPS mission is to assist Canadian Pacific to become the safest and most reliable railway in North America by enhancing public safety, supporting service reliability by reducing train delay, protecting railway personnel, assets, operations and information, and enforcing the law and bringing offenders to justice.[23]

50. Because it is the responsibility of all Canadian Pacific Police Service Employees to protect life, property and railway operations through expeditious and appropriate response to reported incidents, Defendant has a policy requiring that employees document all calls for service and subsequent responses accurately and appropriately.[24]

51. The Code of Conduct contained at Section 1.2.1 of the CPPS  Policy & Procedures Manual ("CPPS") provides that "Neglect of Duty" includes "[f]ailing to report a matter that is a member's duty to report[, or] [o]mitting to make necessary entries in a book or record."  The same section of the CPPS Manual also defines "Deceit" as including, but not limited to, "[k]nowingly making or signing false or misleading statements in any report or

---

[23]    Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 49), the Court will deem this fact established because (1) the fact appears consistent with the rest of the record (*see, e.g., supra,* Statements of Fact Nos. 31-32, 34), (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 49), and (3) the fact is not highly material to this motion.  *See, supra,* note 2 of this Decision and Order.

[24]    The Court has modified the above-stated fact to accord with the cited record evidence. (Dkt. No. 18, Attach. 15, at 35 [attaching page stamped "208"].) Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 50), the Court will deem this fact both established and uncontroverted because (1) the fact is supported elsewhere in the record (*see, e.g.,* Dkt. No. 18, Attach. 20, at 18), and (2) Plaintiff has not effectively denied the above-stated fact (Dkt. No. 24, at ¶ 50).  *See, supra,* note 2 of this Decision and Order.

record," or "[w]illfully or negligently making false, misleading or inaccurate statements pertaining to [the employee's] job duties."[25]

52. Section 3.3 of the CPPS Manual pertaining to Firearms provides that, "[s]hotguns may be carried in CPPS vehicles by members . . . [and] [a] member will sign out a shotgun by completing the User Log."[26]

53. A CPPS Service Order issued June 17, 2009, and effective since July 1, 2009, outlines the CPPS Shotgun Policy which further provides that "[a] shotgun user form . . . will be maintained at every detachment. Members will sign out a shotgun at the commencement of duty and sign back in at the end of duty."[27]

54. The shotgun user logs serve a number of important and legitimate purposes, including tracking frequency of use, condition of the weapon, recorded maintenance, and

---

[25]     Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 51), the Court will deem this fact established because (1) the fact appears consistent with the rest of the record (*see, e.g.,* Dkt. No. 18, Attach. 20, at 10, 19, 39, 42, 67), and (2) Plaintiff has admitted the fact (Dkt. No. 24, at ¶ 51). *See, supra,* note 2 of this Decision and Order.

[26]     Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 52), the Court will deem this fact both established and uncontroverted because (1) the fact appears consistent with the rest of the record (*see, e.g.,* Dkt. No. 18, Attach. 19, at 44-45, 62, 90-92, 115, 122, 123, 138), and (2) Plaintiff has not effectively denied the fact (Dkt. No. 24, at ¶ 52). *See, supra,* note 2 of this Decision and Order. Plaintiff bases his denial on the assertion that he was informed by his sergeant that he did not have to use a shotgun log. (Dkt. No. 24, at ¶ 53.) However, setting aside issues of lack of personal knowledge and hearsay, the fact asserted does not regard what Plaintiff was or was not informed by his prior sergeant.

[27]     Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 53), the Court will deem this fact both established and uncontroverted because (1) the fact appears consistent with the rest of the record (*see, e.g.,* Dkt. No. 18, Attach. 19, at 13-14), and (2) Plaintiff has not effectively denied the fact (Dkt. No. 24, at ¶ 53). *See, supra,* notes 2 and 26 of this Decision and Order.

serviceability issues, and identifying who the users of the equipment were during a specific time period.[28]

55.     Plaintiff acknowledged receipt of the CPPS Policy and Procedure Manual.

56.     Plaintiff is familiar with the rule and policy regarding the shotgun user log requirement.[29]

57.     CPPS Police Headquarters periodically directs audits to be conducted of the shotgun user logs for CPPS detachments.[30]

58.     One such audit of shotgun user logs was ordered for all CPPS detachments across the United States (and Canada) in June 2016 concerning the time period from October 1, 2015, to

---

[28]     Although Defendant supports this factual assertion by citing an inadmissible "declaration" (Dkt. No. 15, at ¶ 54), the Court will deem this fact both established and uncontroverted because (1) the fact is supported elsewhere in the record (*see, e.g.,* Dkt. No. 18, Attach. 28, at 38), and (2) Plaintiff has not effectively denied the fact (Dkt. No. 24, at ¶ 54). *See, supra,* notes 1 of this Decision and Order. Plaintiff supports his denial based on his assertion that he was informed by his sergeant that he did not have to use a shotgun log. (Dkt. No. 24, at ¶ 54.) However, setting aside issues of lack of personal knowledge and hearsay, the fact asserted does not regard what Plaintiff was or was not informed by his prior sergeant.

[29]     Although Plaintiff admits this factual assertion only "in part," he does not specify what portion of the fact he is denying, nor does he cite record evidence that actually controverts the record evidence cited by Defendant. (Dkt. No. 24, at ¶ 57.) Plaintiff again asserts that he was informed by his sergeant that he did not have to use a shotgun log. (*Id*.) However, setting aside issues of lack of personal knowledge and hearsay, the fact asserted does not regard what Plaintiff was or was not informed by his prior sergeant.

[30]     The Court notes that Defendant supports this factual assertion citations to, *inter alia*, Sergeant Seymour's supplemental declaration (Dkt. No. 17, Attach. 6. (Dkt. No. 15, at ¶ 58; Dkt. No. 17, Attach. 6), which the Court finds to be admissible (because it was sworn to pursuant to 28 U.S.C. § 1746), and which the Court finds sufficiently authenticates the e-mail thread with Staff Sergeant Drader. *See Bell v. Rochester Gas & Elec. Corp.,* 329 F. App'x 304, 306 (2d Cir. 2009) (holding that the burden rests with the proponent of documentary evidence and the proponent carries this burden by introducing "sufficient proof . . . [allowing] a reasonable juror [to] find in favor of authenticity"). The Court notes also that Plaintiff's denial is ineffective for the same reason as set forth in note 29 of this Decision and Order.

March 31, 2016.  Information discovered through this regular system-wide audit gave CP reason to notice Plaintiff for hearing under the CBA as discussed herein.[31]

59.    The 2016 Shotgun User Logs Audit was not the first shotgun user log audit headquarters had conducted, a prior one having been conducted in 2013.[32]

Plaintiff's Prior Counseling and Performance Coaching

60.    In a performance evaluation of Plaintiff's from 2004, while rating Plaintiff's communications and interactions skills, his then-supervisor commented as follows: "Uses communication breakdowns to excuse failures. Does not take constructive criticism or corrections well. Needs to take responsibility for situations and act responsibly. Trust? Is trust an issue? With him? About him? Discussed same."  Moreover, while rating Plaintiff's goalsetting and commitment to task, Plaintiff's then-supervisor commented as follows: "Needs to take the lead, see things, change things, do things, report things. Don't always wait for direction."[33]

---

[31]    Although Defendant supports this factual assertion by citing, *inter alia*, an inadmissible "declaration" (Dkt. No. 15, at ¶ 59), the Court will deem this fact both established and uncontroverted because (1) the fact is supported elsewhere in the record (including, but not limited to, the Supplemental Seymour Declaration and exhibits thereto), and (2) Plaintiff has neither expressly denied the fact nor supported that denial with a citation of admissible record evidence that actually controverts the fact asserted (Dkt. No. 24, at ¶ 52).  *See, supra,* notes 2, 12 and 30 of this Decision and Order.

[32]    Plaintiff responds that he has no recollection of the audit.  (Dkt. No. 24, at ¶ 60.)  This is insufficient to create an issue of material fact for trial.  *See, supra,* note 12 of this Decision and Order.

[33]    The Court has modified the above-stated fact to accord with the admissible record evidence cited by Defendant.  (Dkt. No. 18, Attach. 12, at 50.)  The record evidence Plaintiff cites does not actually controvert the above-stated fact.  (Dkt. No. 24, at ¶ 62.) Moreover, his attempt to place the fact in a greater context is in vain.  *See, supra,* note 5 of this Decision and Order.

61.     In a prior email to Plaintiff from 2003, his then-supervisor followed up with him regarding a report that had not been completed by Plaintiff in the time or manner expected by the then-supervisor.[34]

62.     In another email to Plaintiff, his then-supervisor corrected a case number misidentified by Plaintiff on a report and said, "Please remember what I said about the accuracy of reports. It is essential to what we do."[35]

63.     Plaintiff admits that a citizen lodged an Unsafe Vehicle Operation Complaint against him during his employment in 2006, which his then-supervisor met with him about.

64.     During the time period from September through the end of December 2015, Plaintiff's new supervisor, Sergeant Seymour, found the Albany detachment lacking in many areas and he began working with the Special Agents there to bring them up to CPPS standards. This included reminders and coaching on such tasks and responsibilities as vehicle inspections, booking travel, where to focus policing efforts, and following CPPS policies generally. Sergeant Seymour stated that the New York detachment was "lacking of maybe some previous oversight."[36]

---

[34]    The Court has modified the above-stated fact to accord with the admissible record evidence cited by Defendant. (Dkt. No. 18, Attach. 12, at 50-51.) The record evidence Plaintiff cites does not actually controvert the above-stated fact. (Dkt. No. 24, at ¶ 63.) Moreover, his attempt to place the fact in a greater context is in vain. *See, supra,* note 5 of this Decision and Order.

[35]    The Court has modified the above-stated fact to accord with the admissible record evidence cited by Defendant. (Dkt. No. 18, Attach. 12, at 51.) The record evidence Plaintiff cites does not actually controvert the above-stated fact. (Dkt. No. 24, at ¶ 64.) Moreover, his attempt to place the fact in a greater context is in vain. *See, supra,* note 5 of this Decision and Order.

[36]    Although Defendant supports this factual assertion by citing, *inter alia*, exhibits to an inadmissible "declaration" by an apparent non-records keeper (Dkt. No. 15, at ¶ 66), the Court will deem this fact both established and uncontroverted because (1) the fact is supported

65.     District Inspector Dennis Szymaszek and Sergeant Seymour held a video

conference call with the three New York Special Agents in February 2016 to discuss

performance issues. Sergeant Seymour recalls this meeting as a discussion of the detachment's

"shortcomings."[37]

66.     On February 29, 2016, Sergeant Seymour advised Plaintiff that his e-mail

signature was not compliant with the CPPS policy that had been published several years before

then.[38]

67.     On March 1, 2016, Plaintiff was one of several who had to be reminded to submit

his First Aid Certification.[39]

_____

elsewhere in the record (Dkt. No. 18, Attach. 28, at 10-11), and (2) Plaintiff has neither expressly
and specifically denied the fact nor supported any such denial with a citation of admissible
record evidence that actually controverts the fact asserted (Dkt. No. 24, at ¶ 66). *See, supra,* note
2 of this Decision and Order; *see also Willis v. Cty. of Onondaga*, 14-CV-1306, 2016 WL
7116126, at *5, n.10 (N.D.N.Y. Dec. 6, 2016) (Suddaby, C.J.) ("This partial denial is ineffective
. . . [because] it fails to specify which part of the fact is denied as required by Local Rule
7.1[a][3].").

[37]     Although Defendant supports this factual assertion by citing, *inter alia*, an exhibit to an
inadmissible "declaration" by an apparent non-records keeper (Dkt. No. 15, at ¶ 67), the Court
will deem this fact both established and uncontroverted because (1) the fact is supported
elsewhere in the record (Dkt. No. 18, Attach. 28, at 14-15), (2) Plaintiff's attempt to deny a
perceived implication of this factual assertion is in vain, and (3) Plaintiff has supported his denial
with a citation to admissible record evidence that actually controverts the fact asserted (Dkt. No.
24, at ¶ 67). *See, supra,* notes 2 and 5 of this Decision and Order.

[38]     Although Defendant supports this factual assertion by citing an exhibit to an inadmissible
"declaration" by an apparent non-records keeper (Dkt. No. 15, at ¶ 68), the Court will deem this
fact both established and uncontroverted because (1) the fact is supported elsewhere in the record
(Dkt. No. 18, Attach. 12, at 47), (2) Plaintiff's attempt to deny a perceived implication of this
factual assertion is in vain, and (3) Plaintiff has supported his denial with a citation to admissible
record evidence that actually controverts the fact asserted (Dkt. No. 24, at ¶ 67). *See, supra,*
notes 2 and 5 of this Decision and Order.

[39]     Although Defendant supports this factual assertion by citing an exhibit to an inadmissible
"declaration" by an apparent non-records keeper (Dkt. No. 15, at ¶ 69), the Court will deem this
fact both established and uncontroverted because (1) the fact is supported elsewhere in the record
(Dkt. No. 18, Attach. 12, at 47-48), (2) Plaintiff's attempt to deny a perceived implication of this

68.	In mid-March 2016, when performance of the group was still not meeting CPPS expectations, Sergeant Seymour had individual phone conversations with each agent, including Plaintiff, followed by an email on March 16, 2016, to summarize the calls. This email stated as follows:

> Since taking over Sgt. duties for NY, in the last 6 months, we've had several instances of policy and procedure violations, disregarding instructions, disregarding the schedule and a general lack of knowledge of equipment, processes and policy. Not all apply to all of you equally but it is very clear we are far from where you need to be as a detachment and it is noticed above Dennis and I. This is not the kind of notice you want.

69.	On March 28, 2016, Sergeant Seymour e-mailed the NY agents, including Plaintiff, about overdue reports and the importance of completing them on time, which he noted that he had already discussed with them.[40]

70.	On May 11, 2016, Deputy Chief Walker met with the New York agents individually, followed by a group meeting to impress upon them the importance of following CPPS policy and procedure.

71.	In May of 2016 Sergeant Seymour counselled Plaintiff on items including, but not limited to, "starting work on time on the property[,] [s]tarting . . . and ending at the scheduled shift[,] [n]ot changing shifts without notification[,] [f]ollowing up on various incidents[,] and

---

factual assertion is in vain, and (3) Plaintiff has supported his denial with a citation to admissible record evidence that actually controverts the fact asserted (Dkt. No. 24, at ¶ 69). *See, supra,* notes 2 and 5 of this Decision and Order.

[40]	Although Defendant supports this factual assertion by citing an exhibit to an inadmissible "declaration" by an apparent non-records keeper (Dkt. No. 15, at ¶ 71), the Court will deem this fact both established and uncontroverted because (1) the fact is supported elsewhere in the record (Dkt. No. 18, Attach. 12, at 48), (2) Plaintiff's attempt to deny a perceived implication of this factual assertion is in vain, and (3) Plaintiff has not supported any such his denial with a citation to admissible record evidence (Dkt. No. 24, at ¶ 71). *See, supra,* notes 2 and 5 of this Decision and Order.

[s]preading out patrols and enforcement efforts." Sergeant Seymour further noted that the New York agents had "a stretch of territory and they would maybe, for example, focus on a handful of locations that we weren't having any issues with." Sergeant Seymour coached Plaintiff in his May 2016 review that he was "at risk of failing to complete many goals."[41]

72.    On July 19, 2016, Sergeant Seymour followed up with Plaintiff and said, "I still need your vehicle log."

### CPPS Conducts Shotgun User Log Audit in June 2016, Which Leads to CBA Hearing for Plaintiff's Alleged Violation of Maintaining Shotgun Log Policy

73.    In early June 2016, CPPS Headquarters conducted an audit of the shotgun user logs. The audit requested managers of all the various detachments to forward shotgun user logs to Staff Sergeant Jason Drader.[42]

74.    On June 6, 2016, Sergeant Seymour forwarded the shotgun user logs for the Detroit detachment in response to Staff Sergeant Drader's request and indicated he was working on getting the New York logs sent to him.[43]

75.    On June 8, 2016, after trying to obtain them through other means, Sergeant Seymour asked Plaintiff to scan and send him the shotgun user logs for the Albany detachment. However, Plaintiff responded that he does not carry a shotgun. In that e-mail dated June 8, 2016, Plaintiff wrote, "We don't have a shotgun user log at the detachment. REDACTION 3 and

---

[41]    The Court notes that, although the last sentence of the above-stated paragraph is not supported by Sergeant Seymour's deposition transcript, it is supported by Plaintiff's deposition transcript. (Dkt. No. 18, Attach. 12, at 44-45.)

[42]    *See, supra*, note 30 of this Decision and Order.

[43]    *See, supra*, note 30 of this Decision and Order.

myself don't carry a shotgun and they are in the Clifton Park Office. REDACTION 1 has the other shotgun in his vehicle and does a log on his computer."[44]

76.     Sergeant Seymour conducted further review of the matter and, on June 15, 2016, asked Plaintiff when he had last carried a shotgun. By e-mail response on June 15, 2016, Plaintiff said he had not carried a shotgun since February 20, 2013, and he supplied a shotgun log showing his last date of use as February 20, 2013.[45]

77.     Based on the information received, Sergeant Seymour prepared and sent a written summary to the Inspector of Professional Standards, Training & Personnel, Douglas Kinloch. The summary detailed the facts and information pertaining to the shotgun user log matter and asked Inspector Kinloch for his assessment of whether the matter warranted a hearing pursuant to the CBA.[46]

78.     A hearing notice was issued to Plaintiff pursuant to the CBA by letter dated June 17, 2016.[47]

---

[44]     The Court notes that, although Defendant cites only inadmissible declarations and exhibits thereto in support of the above-stated fact, the fact is supported by other admissible evidence in the record. (*See, e.g.,* Dkt. No. 18, Attach. 12, at 37; Dkt. No. 18, Attach. 19, at 11-12, 22-26.) The Court notes further that, although the deposition introducing this document is inadmissible, the above-stated fact is supported elsewhere in the record. (*See, e.g.,* Dkt. No. 18, Attach. 12, ay 38-39.)

[45]     *See, supra,* note 44 of this Decision and Order.

[46]     Defendant supports this factual assertion by citing an "declaration" that was neither signed before a notary public nor sworn pursuant to 28 U.S.C. § 1746. (Dkt. No. 15, at ¶ 80.) As a result, the Court finds that this declaration (Dkt. No. 18, Attach. 32 [Kinloch Decl.]) is inadmissible and will not be considered. However, this fact is supported by other admissible evidence in the record. (*See, e.g.,* Dkt. No. 18, Attach. 28, at 51-52; Dkt. No. 18, Attach. 29, at 26-27.)

[47]     Although Defendant cites "Tab I" (Dkt. No. 18, Attach. 9) as containing the document stamped 1508 (Dkt. No. 15, at ¶ 82), in fact that document is contained at "Tab S" (Dkt. No. 18, Attach. 19, at 2). Furthermore, although this document is introduced by declarations that are

79.     The June 17, 2016, hearing notice advised Plaintiff that he was to attend a formal hearing pursuant to the CBA to determine his responsibility, if any, and whether he violated any Company Rules or Polices in connection with his alleged failure to complete shotgun user logs for the period covering August 2015 to March 2016.[48]

80.     At Plaintiff's request, the hearing was rescheduled from June 23, 2016, to August 18, 2016.  Plaintiff was represented by his Union at the hearing.  During the hearing, Plaintiff had an opportunity to provide testimony, present exhibits, and question and cross-examine witnesses.[49]

81.     The following facts were confirmed and/or newly revealed during the hearing of August 18, 2016:

    a.     the fact that, on June 8, 2016, pursuant to CPPS headquarters' directive that an audit be conducted of the shotgun user logs, Sergeant Seymour asked Plaintiff for a copy of the shotgun user logs for the Albany detachment;

    b.     the fact that Plaintiff responded, however, that he does not carry a shotgun and has not done so since February 20, 2013;

    c.     the fact that he supplied a shotgun log showing his last date of use on February 20, 2013;

---

inadmissible, the above-stated fact is supported by other admissible evidence in the record.  (*See, e.g.*, Dkt. No. 18, Attach. 12, at 38-39.)

[48]     *See, supra*, note 47 of this Decision and Order.

[49]     *See, supra*, note 47 of this Decision and Order; *see also* Dkt. No. 18, Attach. 12, at 39, 54, 69.

d. the fact that District Inspector Szymaszek also testified that, on at least two occasions–August 26, 2015, and September 16, 2015–he personally saw Plaintiff with a shotgun in his vehicle;

e. the fact that, indeed, at the CBA hearing, when questioned about his possession of a shotgun between August 25, 2015, and September 16, 2015, Plaintiff admitted that he had carried a shotgun and failed to fill out the shotgun user log;

f. the fact that, more specifically, Plaintiff admitted that he met with the District Inspector on August 26, 2015, and September 16, 2015;

g. the fact that he also admitted to switching out his shotgun on both dates and that he failed to complete a user log either time;

h. the fact that Plaintiff's only defense was that he was told sometime around February 2013 that he did not have to follow the shotgun log policy; however, he offered no evidence, other than his own testimony, to support this statement;

i. the fact that Plaintiff testified that Sergeant Seymour "knew that wasn't true" when trying to explain the inconsistency of his assertion in his e-mail reply that he last carried a shotgun on February 20, 2013, with his testimony during the CBA hearing that he carried a shotgun on August 25, 2015, and September 16, 2015;

j. the fact that Plaintiff received the CPPS Manual and acknowledged receipt of such as well as of the shotgun user log policy on October 15, 2013; and

k. the fact that Plaintiff had, in fact, carried a shotgun after February 20, 2013, despite his written statements to Sergeant Seymour to the contrary, and admitted

that he did not complete a shotgun log on any occasion that he carried a shotgun after February 20, 2013.[50]

82.     By letter dated September 9, 2016, CP issued Plaintiff a reprimand for his failure to comply with the shotgun user log policy in 2016.[51]

83.     Plaintiff was not pulled from service at any time in connection with the shotgun log incident. He was not suspended. He suffered no loss of pay. He lost no benefits. His hours of work were not affected, and Plaintiff continued working as a Special Agent.

<u>Events Leading to Plaintiff's Dismissal for Established Rule Violation<br>Pursuant to CBA Procedure</u>

84.     On June 10, 2016, District Inspector Szymaszek was reviewing a CP Police Incident Report and observed that, on the previous day, June 9, 2016, a train crew had reported that a group of juveniles had placed obstructions on a track, the train had stopped, and the train crew had requested police support to assist.[52]

---

[50]     The Court finds that Dkt. No. 18, Attach. 19, is admissible for the limited purposes of showing Plaintiff's statements in his hearing, which are unchallenged by him on Defendant's motion. Moreover, the above-stated facts are supported by other admissible evidence in the record. (Dkt. No. 18, Attach. 12, at 37-38; Dkt. No. 18, Attach. 19, at 11-12, 22-27; Dkt. No. 18, Attach. 28, at 32.) Finally, Plaintiff's denial is ineffective as non-responsive to any fact expressly asserted (Dkt. No. 24, at ¶ 71). *See, supra,* note 5 of this Decision and Order.

[51]     Although Defendant's cited evidence is introduced by a declaration that is inadmissible, the above-stated fact is supported by other admissible evidence in the record. (*See, e.g.,* Dkt. No. 18, Attach. 12, at 38-39.)

[52]     Although Defendant's cited evidence includes a declaration that is inadmissible, the above-stated fact is supported by other admissible evidence in the record. (*See, e.g.,* Dkt. No. 18, Attach. 12, at 50-51; Dkt. No. 18, Attach. 20, at 22-30, 34-35; Dkt. No. 18, Attach. 29, at 29-31.) Moreover, Plaintiff's response that he is unable to admit or deny the asserted fact is insufficient to create an issue of fact for trial. (Dkt. No. 24, at ¶ 91.) *See also, supra,* note 12 of this Decision and Order.

85.     Plaintiff and local police were notified.[53]

86.     Plaintiff reported to the CP dispatch that he had responded to the location, that the track was clear, and that the youths were gone when he arrived.[54]

87.     On June 10, 2016, District Inspector Szymaszek asked to discuss the incident by phone with Plaintiff to follow-up and see if there was a need to complete a train-delay report.

88.     Plaintiff contacted District Inspector Szymaszek by phone, discussed the incident with him, and said there was no need for continued investigation.

89.     District Inspector Szymaszek instructed Plaintiff to obtain the train crew information, interview the crew to see if there was a description of the youths, gather train delay information, and gather any other relevant information.[55]

90.     Having not received the follow-up information he requested, District Inspector Szymaszek followed up himself on Monday, June 13, 2016.  He called the police dispatch and learned that Plaintiff had been dispatched to the wrong location on June 9, 2016, and never went to the scene of the actual reported track obstructions.[56]

---

[53]     *See, supra*, note 52 of this Decision and Order.  The asserted fact is supported by other admissible evidence in the record.  (Dkt. No. 18, Attach. 29, at 31.)

[54]     *See, supra*, note 52 of this Decision and Order.  The asserted fact is supported by other admissible evidence in the record.  (Dkt. No. 18, Attach. 20, at 22-30, 34-35; Dkt. No. 18, Attach. 29, at 31.)

[55]     *See, supra*, note 52 of this Decision and Order.  The asserted fact is supported by the other citations provided by Defendant.  (Dkt. No. 18, Attach. 29, at 29-31.)  Moreover, Plaintiff's attempt to controvert the factual assertion by denying what he perceives to be an implication of the factual assertion is in vain.  (Dkt. No. 24, at ¶ 96.) *See also, supra,* note 5 of this Decision and Order.

[56]     *See, supra*, note 52 of this Decision and Order.  The asserted fact is supported by admissible evidence in the record.  (Dkt. No. 18, Attach. 29, at 30-32, 34-35.)

91.     District Inspector Szymaszek's continued investigation revealed that, while Plaintiff was at the wrong location on June 9, 2016, the train crew informed him by radio that he had been dispatched to the wrong location.

92.     Plaintiff confirmed this record of events, noting that he learned of the correct location from the crew engineer, who told him that there were kids around the train crossing but that the train did not have to slow or stop.

93.     Plaintiff also confirmed that the CBA hearing transcript would accurately reflect the events on June 9, 2016.

94.     District Inspector Szymaszek contacted the local Mechanicsville Police Department, spoke with the officer who had responded to the incident, and obtained a copy of his report.[57]

95.     The responding police officer's report confirmed that, on June 9, 2016, Plaintiff became aware that he had been dispatched to the wrong location and that he was given the correct location when he arrived on the scene in Mechanicsville.[58]

96.     Plaintiff never went to the correct location.

97.     On June 9, 2016, and the following days, Plaintiff never told dispatch or District Inspector Szymaszek that, when he reported that the track was clear and youths were gone, he

---

[57]     *See, supra*, note 52 of this Decision and Order.  The asserted fact is supported by other admissible evidence in the record.  (Dkt. No. 18, Attach. 29, at 31-32.)

[58]     The Court finds this report admissible as a public record and/or for the effect on the listener (i.e., District Inspector Szymaszek).  (Dkt. No. 18, Attach. 20, at 52.)  In any event, the factual assertion is established elsewhere in the record. (*See, e.g.,* Dkt. No. 18, Attach. 29, at 31-32.)

was actually referring to the location to which he was dispatched as opposed to the location of the incident.[59]

98. Plaintiff claims that he "used officer discretion to say well, the call's handled."

99. On June 18, 2016, District Inspector Szymaszek sent a written summary of his field investigation of the incident of June 9-10, 2016, described above, to the Inspector of Professional Standards, Training & Personnel, Doug Kinloch.

100. This written summary outlined the steps District Inspector Szymaszek took to investigate the incident.[60]

---

[59] *See, supra*, note 52 of this Decision and Order. The asserted fact is supported by admissible evidence in the record. (Dkt. No. 18, Attach. 12, at 54; Dkt. No. 18, Attach. 20, at 23-24; Dkt. No. 18, Attach. 29, at 31-37.) Moreover, Plaintiff's attempt to controvert the factual assertion by denying what he perceives to be an implication of the factual assertion is in vain. (Dkt. No. 24, at ¶ 106.) *See also, supra,* note 5 of this Decision and Order.

[60] Although Defendant's cited evidence includes a declaration that is inadmissible, the above-stated fact is supported by other admissible evidence in the record. (*See, e.g.,* Dkt. No. 18, Attach. 29, at 28-29.) In support of his denial of this factual assertion, Plaintiff cites generally to his 47-paragraph Statement of Additional Facts in Dispute. (Dkt. No. 24, at ¶ 110.) This is improper. *See also* N.D.N.Y. L.R. 7.1(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established. . . . Each denial shall set forth a specific citation to the record where the factual issue arises."); *Rizzo v. Health Research, Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) (Suddaby, C.J.) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at *1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Janneh v. Regal Entm't*, 07-CV-0079, 2009 WL 2922830, at *1, n.3 (N.D.N.Y. Sept. 8, 2009) (McAvoy, J.) ("In response . . . Janneh filed a 'Statement of Material Facts Not in Dispute.' . . . The document consists of . . . a phrase at the end of the document stating simply: 'See Attached Exhibits.' Janneh's statement fails to comply with the Local Rules which Janneh has repeatedly been advised about . . . ."); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at *2, n.6 (S.D.N.Y. Oct. 17, 2000) ("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts. . . . [A] vague cite to all of the exhibits is simply unacceptable."). The Court deems Plaintiff's response as an admission.

101.    Plaintiff was noticed for hearing regarding the incident of June 9, 2016.[61]

102.    A formal hearing was held on August 18, 2016.  At the formal hearing, Plaintiff was represented by his union and had an opportunity to provide a statement and question and cross-examine witnesses.

103.    In addition to the above, five facts were confirmed and/or newly revealed at the CBA hearing or confirmed by Plaintiff in his statement.[62]

    a.    Specifically, Plaintiff stated as follows:

        Q:    So, Mr. Niedziejko can you explain ah, did you in fact receive information that the correct location for this incident was in Watervliet, New York?
        A:    Yes.
        Q:    Did you respond to that location and investigate whether or not there is debris on the track?  Whether there is any youth in the area?
        A:    No, I didn't respond.

    b.    Plaintiff also stated as follows:

        Q:    Okay. Did you inform the PCC that the actual location of occurrence was in Watervliet?
        A:    No. So much time had passed at that point. They gave me the wrong information to begin with.

    c.    On June 9, 2016, Plaintiff's shift was from 4 p.m. to 2 a.m., and the incident was reported at 5:32 p.m.  Plaintiff testified that, later during that shift, he drove by the area of the incident in Watervliet (approximately thirteen miles from Mechanicsville) twice without going to the correct location to investigate.  In

---

[61]    Although Defendant's cited evidence is inadmissible, the above-stated fact is supported by other admissible evidence in the record.  (*See, e.g.,* Dkt. No. 18, Attach. 12, at 54.)

[62]    The Court finds that Dkt. No. 18, Attach. 20, is admissible for the limited purposes of showing the witnesses statements in Plaintiff's hearing, which are unchallenged by him on Defendant's motion.

addition, Plaintiff testified that at least several hours remained in his shift after he cleared the scene in Mechanicsville.

d.      At the hearing, Plaintiff further admitted to not disclosing to District Inspector Szymaszek on June 10, 2016, during their phone call that he had initially been dispatched to the wrong location. Instead, Plaintiff stated as follows:

> Q:      Alright [sic]. And he mentioned deceit because you didn't tell him where it was actually at. Why didn't you tell him the incident, where the incident actually occurred in Watervilet?
> A:      It was a short call and I was basically cut off.

e.      When asked why Plaintiff did not go to the site at any time or make a report of any form in connection with Watervilet, he replied, "I didn't feel there was a need because there was no criminal activity. There was, there was, as I understood it, there was no track obstruction. From the crew, they said that from their own statements that there was [sic] kids around the tracks. And like I stated earlier there's kids around the tracks in all cities on the railroad."

104.      It is undisputed that Plaintiff did not go to the correct location of the reported track incident in Watervilet.[63]

---

[63]      Although Plaintiff denies this factual assertion, he does not cite record evidence that actually controverts the record evidence cited by Defendant. (Dkt. No. 24, at ¶ 116.)

<u>CP's Post-Hearing Multi-Level Review Concluding that Plaintiff Violated</u>
<u>Multiple CPPS Policies Including Neglect of Duty and Deceit, Warranting Dismissal</u>

105.     Todd Law served as the hearing officer for the hearing held on August 18, 2016, at 1 p.m.

106.     Following the hearing, Law concluded that Plaintiff was in violation of CPPS Policy 1.2.1 through .4 (Code of Conduct: Inappropriate conduct, Insubordination, Neglect of Duty, and Deceit), 3.4 (Incident Management), and 3.51 (Investigations).[64]

107.     Following a review of this conclusion, CP determined that the record supported it.[65]

108.     Sergeant Seymour was not a decision-maker in the decision to terminate Plaintiff's employment.[66]

109.     As set forth in the letter of September 9, 2016, CP made the decision to terminate Plaintiff's employment with CPPS effective immediately.[67]

---

[64]     Although Law's written summary of findings is not admissible in current form, the Court finds that it can be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). In any event, the Court finds that the factual assertion is supported elsewhere in the copious record.

[65]     Although admissibility problems plague the evidence cited by Plaintiff (for reasons previously stated), the Court finds that, at the very least, the above-stated fact is supported by those portions of that evidence which can be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). In any event, the Court finds that that the above-stated fact is supported elsewhere in the copious record.

[66]     The Court finds that that the above-stated fact is supported in the record.  (*See, e.g.,* Dkt. No. 18, Attach. 28, at 11-12.)  Plaintiff's response that he is unable to admit or deny the asserted fact is insufficient to create an issue of fact for trial.  (Dkt. No. 24, at ¶ 126.)  *See also, supra,* note 12 of this Decision and Order.  In addition, Plaintiff does not provide a record citation supporting a denial.

[67]     The Court finds that that the above-stated fact is supported in the record.  (*See, e.g.,* Dkt. No. 18, Attach. 12, at 56.)  Additionally, Plaintiff improperly denied this fact without providing any record citation.  (Dkt. No. 24, at ¶ 128.) *See also* Fed. R. Civ. P. 56(c)(1)(A) ("A party

110.    In his Complaint, Plaintiff alleges that he took issue with CP's on-call and scheduling decisions.

111.    Aside from alleging that he spoke with his Union co-worker, REDACTION 3, who was also the Union representative but who was not a CP manager, Plaintiff makes only one allegation of a specific conversation he had with a CP manager in paragraph 21 of his Complaint. Plaintiff alleges that, "[o]n or about March 30, 2016, Plaintiff informed his supervisor, Sgt. Seymour in Detroit, Michigan that he had a safety complaint about the manner in which he was being scheduled to work including the need to work excessive overtime and being on call without a break, or time off."

112.    Plaintiff's unsworn "affidavit," filed in support of his opposition to CP's motion for summary decision before the ALJ in this matter, described an alleged "Spring of 2016" conversation in which he states that he and REDACTION 3 "had a conversation with Sgt. Seymour in Detroit, Michigan about scheduling, overtime, and other union issues."[68]

---

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of the record . . . or . . . showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."); N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs."); *N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations").

[68]    The Court notes that, although the parties characterize Plaintiff's affidavit as "sworn," in fact it was neither signed before a notary public nor sworn pursuant to 28 U.S.C. § 1746.  (Dkt. No. 18, Attach. 36, at 2-4.)

113. Sergeant Seymour recalls no conversation during which Plaintiff attributed his complaining about his scheduled on-call hours to a hazardous safety concern.

114. In his OSHA complaint, Plaintiff identified two periods in June and July of 2016 in which he allegedly was on-call for extended periods of time.[69]

115. In his OSHA complaint and objections to the OSHA dismissal, the only specific dates that Plaintiff complains about being on-call for an extended period relate to a "two-three week[]" period in June/July 2016. This on-call rotation Plaintiff describes from June/July 2016 was a deviation from the normal course of business due to two other Special Agents out of the Albany detachment being on leave during such time.[70]

116. Sergeant Seymour recalls that it would be "quite rare" for a New York Special Agent to be called to do a job while they were on call.[71]

117. Sergeant Seymour recalled generalized complaints in the NY detachment about Sergeant Seymour's remote supervision (from Detroit) and the fact that the New York agents felt

---

[69] Although admissibility problems plague the evidence cited by Plaintiff (for reasons previously stated), the Court finds that, at the very least, the above-stated fact is supported by those portions of that evidence which can be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). In any event, the Court finds that that the above-stated fact is supported elsewhere in the copious record. Moreover, Plaintiff's denial is ineffective because (1) neither of the two "declarations" he cites were signed before a notary public or sworn to pursuant to 28 U.S.C. § 1746, and (2) he fails to cite any specific paragraph(s) in those declarations.

[70] *See, supra,* note 69 of this Decision and Order. (*See also* Dkt. No. 18, Attach. 12, at 19.)

[71] Plaintiff's denial is ineffective because (1) neither of the two "declarations" he cites were signed before a notary public or sworn to pursuant to 28 U.S.C. § 1746, and (2) he fails to cite any specific paragraph(s) in those declarations.

they had to perform additional work as a result (e.g., completing vehicle logs and faxing them to Sergeant Seymour).[72]

118.    Notably, even these types of non-safety-related complaints that Sergeant Seymour recalls, came from a different New York Special Agent and not Plaintiff himself.[73]

119.    Plaintiff admits that, when they had issues as a group, the detachment would discuss filing a grievance "because [management is] not following certain procedures and scheduling issues and stuff like that."[74]

120.    Plaintiff has had at least five opportunities to set forth what alleged complaints about safety he allegedly made to CP management:[75] (1) he provided a statement at his CBA disciplinary hearing; (2) he filed an OSHA complaint with a written narrative; (3) when OSHA found no probable cause for his allegations, he appealed the OSHA complaint with a similar written narrative;[76] (4) during the course of discovery related to his OSHA appeal, Plaintiff gave

---

[72]     *See, supra,* note 71 of this Decision and Order.

[73]     Plaintiff neither admits nor denies this asserted fact.  (Dkt. No. 24, at ¶ 137.)  This is improper.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's *assertions* in matching numbered paragraphs.") (emphasis added); *In re Horowitz*, 2016 WL 1039581, at *1 n.2.  In any event, Plaintiff cites two declarations that are inadmissible.  *See, supra*, note 71 of this Decision and Order.

[74]     Although Plaintiff denies this fact in part, he does not specify which part of the fact he is denying.  (Dkt. No. 24, at ¶ 138.)  This is improper.  *See, supra,* note 5 of this Decision and Order.  In any event, the portion of the record that Plaintiff cites does not actually controvert the above-stated fact.

[75]     Plaintiff improperly denies this fact without setting forth any record citation.  *See, supra*, note 67 of this Decision and Order.

[76]     The Court notes that this asserted fact is not supported by the citation provided by Defendant.  (Dkt. No. 15, at ¶ 139[c].)  However, it is supported by Dkt. No. 18, Attach. 4, at 3-6 (which, although not currently in admissible form, the Court finds can be presented in a form that would be admissible at trial).

sworn testimony through a deposition; and (5) in opposition to CP's motion for summary decision before the ALJ, Plaintiff filed an unsworn affidavit in support of his opposition memorandum.

121.    Plaintiff testified that he never personally made a complaint about a hazardous safety-related concern.  In fact, he testified to the contrary on the following occasions:

a.      In his deposition, he testified as follows:

Q:      When you say it's a safety concern, can you tell me, specifically, you, yourself, when you personally, if ever, told a C.P. manager that?
A:      I told my union rep because they wanted us to follow the chain of command, so.

b.      He also testified as follows:

Q:      . . . you personally didn't directly speak to them about the issue?
A:      No.
Q:      Do you know what, if anything, the topic of any other union grievances were, aside from the–the scheduling on-call issue?
A:      No.  I–I–I'm not sure.

c.      He also testified as follows:

Q:      Well, do you remember talking about that grievance you mentioned in early 2015 that your union–
A:      I–you're going to have to speak–
Q:      –that you–?
A:      –you're going to have to speak with REDACTION 3 in reference to what was filed, when it was filed all that kind of stuff.
Q:      Okay.  Well here's–here's my question.
        Other–other than that grievance relating to the scheduling and on-call, my question is it–other than that, are there any other reports that you haven't raised or talked about today, that you claim to have made that you claim consist–or constitute a hazardous safety railroad-security concern, that you brought to C.P. management's attention?
A:      The union did.
Q:      It would only be the union?

| | |
|---|---|
| A: | They want– |
| Q: | Not you? |
| A: | –they–they wanted to use the chain of command, so that's how we did it. |
| Q: | Okay. So, in–to the extent any such reports exist, they come through the union, is what you're saying and your recollection is they are contained in this grievance from early 2015? |
| A: | I–I don't know. |
| Q: | Okay. You–you can't speak to any personal reports, you individual[ly] and personally made to C.P. management? |
| A: | No. |

    d.      He also testified that he never made any reports to Human Resources during his employment with CP.

    e.      He also testified that he cannot speak to, recall, or reference any "personal reports" that he, "individually and personally made to CP management."

    f.      He also responded, "No," when asked specifically about the alleged safety concerns about which he now claims as protected activity and whether he ever personally spoke to any CP manager directly.

    g.      Finally, he offered the following explanation for this alleged "safety concern": "[Dennis and Kevin] would always have a different interpretation of the contract."[77]

122.    Plaintiff produced an email he sent to Deputy Chief Walker on May 18, 2016, following a meeting in Albany, New York. The email, however, was about current practices on how members record their daily and weekly activities and looking for ways to "make it more efficient for the members and the police service." The email makes no reference to anything

---

[77]    Plaintiff's denial is ineffective because (1) neither of the two "declarations" he cites were signed before a notary public or sworn to pursuant to 28 U.S.C. § 1746, and (2) he fails to cite any specific paragraph(s) in those declarations.

"unsafe" or "hazardous." Indeed, Plaintiff admitted during his deposition that his email makes no "hazardous-condition report[]," or claims "any kind of safety hazard."

123.    Despite the above sworn testimony and other evidence in this case, Plaintiff now alleges in his Complaint that, in March 2016, he complained to Sergeant Seymour about his overtime and on-call schedule, and that he told Sergeant Seymour this was a "safety complaint."[78]

124.    In his objections to OSHA's dismissal order, Plaintiff stated, "Our union representative has told District Inspector Szymaszek that they are running us ragged and it is against labor laws to have us work so many days in a row without complete days off."[79]

125.    District Inspector Szymaszek does not believe he received any complaints about the on-call procedures in place between September 2015 and September 2016 in the Albany detachment, and at no point in time did he become aware that Plaintiff had complained that he was experiencing health issues related to the hours of work and hours of being on-call; and Sergeant Seymour does not recall receiving any complaints regarding the on-call procedures in place between September 2015 and September 2016 in the Albany detachment, nor was he aware of any safety hazards between September 2015 to July 2016. [80]

126.    Sergeant Seymour recalls speaking with the Union representative, Mary Gunn, during which she communicated that the agents had an issue with Sergeant Seymour's "remote supervision" (from Detroit) and that the other detachments with an on-site supervisor did not

---

[78]    *See, supra,* note 77 of this Decision and Order.

[79]    *See, supra,* note 77 of this Decision and Order.

[80]    The Court has modified the above-stated facts to accord with the cited record evidence. (Dkt. No. 18, Attach. 28, at 20, 35; Dkt. No. 18, Attach. 29, at 14, 21-22.) Plaintiff's denial is ineffective for the reasons stated above in note 77 of this Decision and Order.

have to do some of the things being asked of the New York agents, "such as scanning their vehicle logs and sending them to [Sergeant Seymour.]"[81]

127.    Sergeant Seymour testified that even this type of complaint, as communicated from the union representative, referred to the New York agents collectively or "some of the guys" and nothing was specific to Plaintiff.[82]

128.    Similarly, Plaintiff testified that the New York detachment supervisors were "trying to supervise from, you know, a thousand miles away."

129.    Plaintiff further testified that he does not know Mary Gunn.

130.    Plaintiff offers no evidence of having engaged in FRSA protected activity, except that he recalls that, sometime in "early 2015," he believes a grievance was filed; he offers no details about the grievance, what was contained in the grievance, or whether Defendant ever received such a grievance.[83]

131.    CP's Labor Relations department has no record of any union grievance or other communication from the union on behalf of Plaintiff alleging claims or complaints relating to a hazardous safety issue or concern.[84]

132.    In his OSHA complaint of June 21, 2016, Plaintiff alleged that his protected activity refers to a Union grievance filed on behalf of the collective group of New York Special Agents, which was submitted by the Union in "early 2015."

---

[81]    *See, supra,* note 77 of this Decision and Order.

[82]    *See, supra,* note 77 of this Decision and Order.

[83]    *See, supra,* note 77 of this Decision and Order.

[84]    *See, supra,* note 77 of this Decision and Order.  The Court notes that the Scudds Declaration is properly certified pursuant to 28 U.S.C. § 1746.  (Dkt. No. 18, Attach. 35, at 4.)

133.    In his deposition, Plaintiff testified as follows:

> Q:    I'd like to know from you, what evidence you have, or facts and circumstances you're going to rely on, to claim that your termination was intentional retaliation for this grievance you reference was made in early 2015.
>
> A:    Well, if you look at the form–the facts of the case, I mean, this all started when Dennis and Kevin took over, basically.  We never had any issues with the company before these two.
>
> Q:    Anything else?
>
> A:    Not that I can recall right now.

134.    Plaintiff's Complaint in this action does not allege that a formal Union safety grievance was filed in "early 2015."  Instead, the Complaint alleges that "[s]tarting in March 2016 and continuing into June 2016, Mr. Niedziejko and his fellow employees including but not limited to Michael Savokinas made several complaints regarding the safety of the work practice of having workers stay on call without days off and limitation for extended periods of time."  Plaintiff's Complaint also does not allege other previously asserted complaints about dispatch, triplicate documentation, remote supervision, and purported age discrimination.[85]

135.    Plaintiff alleges he was overworked with his on-call schedule.  Plaintiff's OSHA complaint identifies two specific periods of time during which, he was "on call" for a consecutive period (June 8, 2016, through June 26, 2016, and July 6, 2016, through July 17, 2016).  Plaintiff's Complaint describes this same discrete period beginning June 2016.[86]

---

[85]    The above-stated fact is established by Plaintiff's Complaint in this action.  (Dkt. No. 1.)  Plaintiff improperly denied the above-stated fact without providing any record citation for the dispute of fact.  (Dkt. No. 24, at ¶ 154.)  *See also, supra*, note 67 of this Decision and Order.

[86]    *See, supra,* note 77 of this Decision and Order.  The Court notes that the above-stated fact is established by Plaintiff's Complaint in this action.  (Dkt. No. 1.)

136.     Notably, Plaintiff was off for one-week vacations the week leading up to each of these on-call periods of time.  Specifically, he was on vacation from May 29, 2016, through June 7, 2016, and again from June 26, 2016, through July 5, 2016.[87]

137.     Plaintiff admits that, during the approximately eighteen months that preceded his termination, he worked the midnight-shift as a part-time police officer for the Ballston Spa Police Department on his days off from CP.

### Plaintiff's Filing of an OSHA Complaint

138.     Plaintiff filed an OSHA complaint on or about June 21, 2016.

139.     Plaintiff's OSHA complaint sets forth the following seven grievances: (1) being on call without days off; (2) being on call but receiving no compensation (pay) for it, and the Union representative being advised that "[u]nion members do not receive compensation for on call during days off"; (3) working so many days without complete days off as being "against our [U]nion contract"; (4) needing to complete "triplicate documentation" as "only one example of the discriminatory behavior towards [U]nion members;" (5) noting that the Union "filed a grievance" over the frequent scheduling of being on call; (6) noting a meeting held with management about "scheduling, overtime and other union issues"; and (7) classifying a hearing and purported discipline as being "against the [U]nion contract" where they occur beyond 15 days of an incident.

---

[87]     The Court notes that the above-stated fact is supported by the record.  (*See, e.g.*, Dkt. No. 17, Attach. 3.)

140. At the time Plaintiff filed his OSHA complaint, Defendant had not issued any discipline to Plaintiff.[88]

141. Rather, when Plaintiff filed his OSHA complaint, Defendant had only issued contractually-required hearing notices pursuant to the governing CBA for each of the separate and unrelated incidents of potential rule violations, the first regarding the alleged failure to maintain the shotgun user log, and the second relating to Plaintiff's alleged deceit and neglect of duty pertaining to his response and investigation of a track obstruction and trespasser incident on June 9, 2016.[89]

142. Plaintiff testified that such hearing notices are contractually required by the CBA when an employee is charged with a disciplinary violation.[90]

143. As each hearing notice advised, the hearings for the separate alleged incident violations were scheduled to take place on June 23, 2016 (shotgun allegations) and June 24, 2016 (neglect of duty and deceit allegations).[91]

144. However, pursuant to the Union's request–and Defendant's grant of such request–the hearing was postponed.[92]

---

[88] Plaintiff improperly denies this fact without setting forth any record citation. *See, supra*, note 67 of this Decision and Order. Moreover, the factual assertion expressly regards discipline, not mere charges.

[89] The Court notes that this asserted fact is supported by the record. (*See, e.g.,* Dkt. No. 18, Attach. 19, at 2; Dkt. No. 18, Attach. 20, at 39.)

[90] The Court has modified the above-stated fact to accord with the cited record evidence. (Dkt. No. 18, Attach. 12, at 39; Dkt. No. 25, Attach. 7; Dkt. No. 25, Attach. 8.)

[91] The Court finds that this factual assertion is supported by admissible record evidence. (*Compare* Dkt. No. 25, Attach. 7, *and* Dkt. No. 25, Attach. 8, *with* Dkt. No. 18, Attach. 19, at 2, *and* Dkt. No. 18, Attach. 20, at 39.)

[92] Although Defendant's cited record evidence is not admissible in current form, the Court finds that it can be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2).

145. By email of September 13, 2016, OSHA advised CP that Plaintiff wished to amend his OSHA complaint to address his termination.[93]

146. Nothing further was alleged or provided from OSHA in terms of amendment; and Plaintiff never sought to amend his OSHA complaint to challenge the reprimand issue following the hearing on the shotgun user log violation.[94]

147. Plaintiff admits that (1) he was not held out of service for any period of time related to the shotgun user log incident, (2) he lost no pay, (3) he lost no benefits, (4) his hours of work were not affected, and (5) he continued working as a Special Agent with no change to the terms and conditions of his employment.

<u>OSHA Investigates and Dismisses Plaintiff's OSHA Complaint</u>

148. OSHA conducted an independent investigation of Plaintiff's OSHA complaint, detailing Plaintiff's allegations that Defendant purportedly harassed him, improperly brought him up on charges, then terminated his employment because he (a) voiced a safety concern about the lack of Special Agents, hours on call without compensation, and lack of rest, (b) made complaints to Defendant about being dispatched to calls numerous times by the communications

---

(Dkt. No. 18, Attach. 19, at 98; Dkt. No. 18, Attach. 20, at 40.) In any event, the Court finds that the factual assertion is supported elsewhere in the copious record.

[93]    Although Defendant's cited record evidence is not admissible in current form, the Court finds that it can be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). (Dkt. No. 18, Attach. 2, at 2-3.) In any event, the Court finds that the factual assertion is supported elsewhere in the copious record.

[94]    *See, supra,* note 93 of this Decision and Order.

center, and (c) was being scrutinized by Defendant because of his age and for being a Union member.[95]

149.    Following such investigatory review, OSHA dismissed Plaintiff's OSHA complaint with findings and an amended decision dated July 6, 2017.[96]

150.    Specifically, OSHA found that Plaintiff failed to establish, *inter alia*, that he engaged in FRSA-protected conduct or that CP's decision to terminate his employment for the established rule violations committed in connection with the trespass and obstruction incident on June 9-10, 2016, was in retaliation for the alleged protected activity he claimed.  OSHA held that

> [Plaintiff] does not have protected activity under the FRSA.  Even if it was determined that he had FRSA protected activity with [CP's] knowledge, evidence shows [CP] issued [Plaintiff] the hearing notices, sent him to a hearing then terminated his employment, for legitimate, non-retaliatory business reasons and not in retaliation for his alleged protected activity as claimed.  Consequently, this complaint is dismissed.[97]

---

[95]    Although some of Defendant's cited record evidence is not admissible in current form, the Court finds that it can be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). (Dkt. No. 18, Attach. 1, at 4.) In any event, the Court finds that the factual assertion is supported elsewhere in the copious record.

[96]    The Court notes that, although this asserted fact is not supported by the citation provided by Defendant (Dkt. No. 15, at ¶ 171), it is supported elsewhere in the record (*see, e.g.,* Dkt. No. 18, Attach. 3, at 8-12; Dkt. No. 18, Attach. 12, at 61).

[97]    The Court notes that, although this asserted fact is not supported by the citation provided by Defendant (Dkt. No. 15, at ¶ 172), it is supported elsewhere in the record (see, e.g., Dkt. No. 18, Attach. 3).  Moreover, Plaintiff's denial of this asserted fact is ineffective because the asserted fact regard's OSHA's findings, not Plaintiff's agreement or disagreement with them.

<u>Plaintiff Objects to OSHA's Decision to Dismiss His OSHA Complaint and
Proceeds Before an Administrative Law Judge ("ALJ")</u>

151.    Plaintiff thereafter appealed OSHA's findings and decision by request dated

August 1, 2017, to the ALJ.[98]

152.    A discovery period ensued, which included exchange of initial disclosures by the

parties, services and response to discovery requests, and production of documents including

third-party records such as the past employment and medical records of Plaintiff.  Plaintiff took

both depositions it requested: (1) then-Sergeant Kevin Seymour, and (2) District Inspector

Dennis Szymaszek.  Defendant took the deposition of Plaintiff.

153.    In his deposition, Plaintiff testified as follows, in pertinent part: (1) his Union

representatives "were the ones advising Dennis and Kevin they couldn't be doing that, that it was

a violation of the contract"; (2) the Unionized police department was a target for discrimination;

(3) "Anyone who–who made any kind of grievance, or you know, objected to their way of doing

things, which they weren't following the contract, so we used our right as a union member, to file

a grievance because they didn't want to work with us on the scheduling"; and (4) "So it was

pretty–pretty obvious.  We were, you know, getting retaliated against because we wanted to

enforce our union contract."[99]

---

[98]    The Court finds that, although the record evidence cited by Defendant is not currently in
admissible form (Dkt. No. 18, Attach. 4), the Court finds that it can be presented in a form that
would be admissible at trial.

[99]    In support of his denial of this factual assertion, Plaintiff improperly cited to his entire
deposition testimony rather than any specific location in the record.  (Dkt. No. 24, at ¶ 175.)  *See
also, supra*, note 5 of this Decision and Order.

154.     On March 7, 2018, Defendant filed a motion for summary decision with the Office of Administrative Law Judges, to which Plaintiff submitted an opposition response and Defendant replied.

155.     During a pre-trial telephone conference call, the ALJ communicated that he was holding his decision on Defendant's motion for summary decision in abeyance.

156.     By separate Order dated April 27, 2018, the hearing was continued upon "conferring with the parties and with their consent" and re-scheduled to commence on June 13, 2018, in Albany, New York.

157.     However, on May 25, 2018, Plaintiff filed (through counsel) a notice of intent to opt out to federal court.  On June 5, 2018, the ALJ held a conference with the parties to discuss Plaintiff's notice of intent "given the timing of the filing on the eve of trial."

158.     On June 8, 2018, Plaintiff's counsel served Defense counsel with a copy of the Complaint he had filed in federal court the day before.

159.     On June 11, 2018, the ALJ issued an Order canceling the hearing and dismissing the case with prejudice from jurisdiction of the ALJ.

160.     This matter has been litigated for more than two years, since Plaintiff first filed his OSHA complaint in June 2016.  During that time period, Defendant prevailed at OSHA after that department's review and investigation of Plaintiff's claim and the record has been developed through litigation before the ALJ.

## C.     Parties' Briefing on Defendant's Motion

### 1.     Defendant's Memorandum of Law

Generally, in support of its motion to dismiss or, alternatively, for summary judgment, Defendant asserts five arguments.  (*See generally* Dkt. No. 13 [Def.'s Mem. of Law].)

First, Defendant argues that the Court lacks subject-matter jurisdiction over Plaintiff's Complaint because the Complaint is precluded by the Railway Labor Act, 45 U.S.C. §§ 151 *et seq*. (1994) ("RLA"), which requires that "minor disputes" between rail carriers and their employees be arbitrated, not litigated. (*Id.*) More specifically, Defendant argues that disputes involving an employer's enforcement of company policies, a supervisor's instructions, or the initiation of disciplinary investigations under a collective bargaining agreement ("CBA") are all minor disputes precluded by the RLA, and that the alleged protected activities that Plaintiff engaged in are merely Plaintiff's grievances over terms of the governing CBA. (*Id.*) Defendant argues that, for example, Plaintiff's claims relate to work hours, work scheduling, on-call schedule, overtime, staffing levels, pay claims, and dismissal and hearing notices, all of which are governed by the CBA and thus must be litigated pursuant to the RLA. (*Id.*)

Second, Defendant argues that Plaintiff's Complaint fails to state a claim because it does not allege facts plausibly suggesting that he engaged in FRSA-protected activity. (*Id.*) More specifically, Defendant argues that OSHA exhaustively reviewed Plaintiff's grievances, which were set forth in his OSHA complaint, and concluded that none of Plaintiff's asserted activities were protected by the FRSA. (*Id.*)

Third, Defendant argues that, in the alternative, Plaintiff cannot make a *prima facie* showing that (a) he engaged in good-faith FRSA-protected activity before Defendant took steps to investigate Plaintiff's alleged misconduct, (b) the decision-maker(s) knew of that alleged protected activity, and (c) that the alleged protected activity was a contributing factor in the decision to dismiss him. (*Id.*) Regarding requirement "(a)," Defendant argues that it took steps to investigate Plaintiff's alleged misconduct before Plaintiff reported a safety violation and that, in any event, Plaintiff did not either subjectively or objectively believe the conduct he reported

presented an actual hazardous safety condition at the time based on the undisputed facts (including, but not limited to, Statement of Fact Numbers 8, 17, 106, 107, 136 and 137 above). (*Id*.) Regarding requirement "(b)," Defendant argues that Plaintiff cannot establish that the decision-makers involved in the post-hearing multi-level review process relating to his dismissal (e.g., District Inspector Law, Deputy Chief Walker, or Chief Marchant) were personally aware of his alleged protected activity before they initiated a hearing notice (and, indeed, Plaintiff cannot recall a single "personal report" that he "individually and personally made to CP management," *see, supra,* Statement of Fact Number 121[c]). (*Id*.) Regarding requirement "(c)," Defendant argues that, although the crux if Plaintiff's FRSA retaliation claim is "discriminatory animus," he cannot establish that Defendant's dismissal decision was based on such discriminatory animus given, among other things, (i) the fact that Plaintiff was coached and counseled for deficient work performance before he engaged in the alleged protected activity (*see, supra,* Statement of Fact Numbers 60-72), (ii) the evidence that Plaintiff's dismissal was based on his deceitful and neglectful actions in connection with the track obstruction and trespasser incident on June 9, 2016, (iii) the one-and-one-half-year lapse between Plaintiff's alleged protected activity and his dismissal, and (iv) the fact that Sergeant Seymour, with whom Plaintiff alleges he had a conversation about overtime and scheduling concerns in March 2016, was not a decision-maker with regard to Plaintiff's dismissal (*see, supra,* Statement of Fact Number 108). (*Id.*)

Fourth, Defendant argues that, in the alternative, it would have taken the same action regardless of Plaintiff's alleged protected activity. (*Id.*) More specifically, Defendant argues that the evidence from the CBA hearing established Plaintiff's non-compliance and neglect of duty in connection with his response and investigation of the track obstruction and trespasser

incident on June 9, 2016, which fully warranted his dismissal regardless of any FRSA-protected activity in which he may have engaged. (*Id.*)

Fifth, Defendant argues that, at a minimum, to the extent Plaintiff's Complaint asserts a claim arising from the reprimand he received for violation of the shotgun log policy, that portion of the Complaint must be dismissed based on (a) a failure to exhaust his administrative remedies regarding that claim (due to his failure to previously challenge the reprimand), (b) the untimeliness of that claim and (c) the fact that the reprimand did not constitute an adverse action. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion, Plaintiff asserts two arguments. (*See generally* Dkt. No. 23 [Plf.'s Opp'n Mem. of Law].)

First, Plaintiff argues that the RLA does not preclude a FRSA complaint. (*Id.*) More specifically, Plaintiff argues that the 2007 amendments to the FRSA make clear that its protection against whistleblower discrimination exists in addition to the collective bargaining remedies available to an employee under the RLA. (*Id.*) In addition, Plaintiff argues that the record contains evidence that he made safety complaints to decision-making supervisors, including through (a) his March 2016 conversation with District Inspector Szymaszek, (b) his separate March 2016 conversation with Sergeant Seymour in Detroit during firearms training, and (c) his conversation with Jim Thomas, in which Mr. Thomas informed him that District Inspector Szymaszek had called the Superintendent to inquire about the disciplinary process with the goal of firing and writing up Plaintiff. (*Id.*) Plaintiff further argues that District Inspector Szymaszek was a decision-making supervisor with regard to Plaintiff's disciplinary hearing and termination because (a) District Inspector Szymaszek sent an e-mail to Inspector Kinloch

outlining his investigation and requesting a hearing, and (b) District Inspector Szymaszek was copied on the letter that put Plaintiff on notice of his disciplinary hearing. (*Id.*)

Second, Plaintiff argues that there is evidence in the record establishing that he was reprimanded and terminated for FRSA-protected activity, which included making safety complaints about his work and on-call schedule. (*Id.*) More specifically, Plaintiff argues that there is evidence that he (a) was an exceptional police officer, (b) made complaints to the Superintendent of his police department directly and had his union representatives make complaints for him regarding safety concerns, and (c) was disciplined for those complaints. (*Id.*) In addition, Plaintiff argues that the Court need not accept Defendant's purportedly non-retaliatory motive for dismissing him (i.e., dishonesty) because (a) the record establishes that Defendant's allegation that Plaintiff was deceitful is without merit, (b) the record establishes that similar violations of the shotgun policy either did not result in discipline or were handled in an informal manner, (c) the temporal proximity between Plaintiff's safety complaints and the discipline is circumstantial evidence of discrimination, (d) the record establishes that Defendant withheld exculpatory evidence from Plaintiff regarding the dispatcher's error on June 9, 2016, (e) the record establishes that District Inspector Szymaszek's testimony, which formed the sole basis of Defendant's case at both of Plaintiff's disciplinary hearings, is unreliable, and (f) Defendant's attempt to take inconsequential work instructions and redefine them as reprimands is overreaching in light of Plaintiff's fourteen-year employment with Defendant during which he was not disciplined until the shotgun policy incident. (*Id.*)[100]

---

[100]    Plaintiff's opposition memorandum of law does not address Defendant's fifth argument. (*See generally* Dkt. No. 23.) Out of special solicitude to Plaintiff as a civil rights litigant, the Court will assume he has sufficiently addressed Defendant's second argument, although (despite reciting the Rule 12[b][6] standard) Plaintiff appears to rely on record evidence in all of his arguments. (*Id.*)

### 3.    Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant asserts four arguments.  (Dkt. No. 26 [Def.'s Reply Mem. of Law].)

First, Defendant argues that Plaintiff misapprehends its RLA preemption argument and thus his FRSA claims must be dismissed.  (*Id.*)  More specifically, Defendant argues that an essential element of Plaintiff's FRSA claims is showing that he engaged in FRSA-protected activity, which Plaintiff alleges he did in the form of making complaints about on-call scheduling, staffing, and overtime.  (*Id.*)  However, Defendant argues that one cannot determine if the manner in which Defendant scheduled employees to work violated the CBA (much less created a hazardous safety condition) without interpreting or applying the negotiated CBA terms and provisions that specifically address those issues; thus, Plaintiff's claims are precluded by the RLA and must be dismissed.  (*Id.*)

Second, Defendant argues that, even if not dismissed on RLA preemption grounds, Plaintiff's FRSA claims fail on the merits because he cannot establish knowledge.  (*Id.*)  More specifically, Defendant argues that "[i]n direct contravention to his deposition testimony . . . Plaintiff now claims that he directly complained about scheduling matters to Dennis Szymaszek . . . and Kevin Seymour . . . [b]ut even assuming these new allegations are true for purposes of this motion, Plaintiff's FRSA claim still fails because neither Szymaszek nor Seymour were actual decision-makers in Plaintiff's dismissal."  (*Id.*)  Defendant argues that Plaintiff produced no admissible evidence that Inspector Kinloch, District Inspector Law, Deputy Chief Walker, and Chief Marchant (the decision-makers involved in Plaintiff's dismissal) knew about Plaintiff's purported safety complaints (*see, e.g., supra,* Statement of Fact Number 125).  (*Id.*)

Third, Defendant argues Plaintiff cannot establish a contributory cause because to do so he must establish a discriminatory animus, and here he cannot establish discriminatory animus on the current record. (*Id.*) More specifically, Defendant argues that Plaintiff cannot establish discriminatory animus for the following reasons: (a) his attempt to shorten the time gap between his purported safety complaints and his termination fails to establish sufficient temporal proximity to raise an inference of retaliatory intent; (b) he has failed to present admissible evidence that he personally engaged in FRSA-protected activity; (c) he has failed to present admissible evidence that any of his purported concerns were beyond CBA-contract-based grievances, which are preempted by the RLA; and (d) he has failed to present admissible evidence that the purported CBA-grievances were in any way presented or described to Defendant as a "hazardous safety condition." (*Id.*) In addition, Defendant argues that, in an attempt to establish discriminatory animus, Plaintiff misstates the record in the following ways: (a) contrary to what Plaintiff argues, Sergeant Seymour is not similarly situated to Plaintiff and his testimony that he was not "reprimanded" is not inconsistent with District Inspector Szymaszek's testimony that Szymaszek "had a discussion [with Seymour] and he was [informally] counseled"; (b) contrary to what Plaintiff argues, the record contains undisputed evidence that the audit of the shotgun user logs was not manufactured or created solely for retaliatory purposes and instead was also conducted in 2013; and (c) Plaintiff's assertion that Defendant withheld exculpatory evidence is a misstatement of fact because the CBA hearing transcript reflects that District Inspector Szymaszek directly spoke of the incorrect dispatch location and there is no admissible evidence that Defendant's basis for Plaintiff's dismissal has ever shifted. (*Id.*)

Fourth, Defendant argues that, at a minimum, Plaintiff's admissions require dismissal of his reprimand claim. (*Id.*) More specifically, Defendant argues that (a) in his opposition memorandum of law, Plaintiff does not oppose Defendant's challenge to this claim, and (b) indeed, he admits that he did not amend his OSHA complaint to challenge the reprimand and it is too late to do so now. (*Id.*)

## II. GOVERNING LEGAL STANDARDS

### A. Standard Governing Motion to Dismiss for Lack of Subject-Matter Jurisdiction Under Fed. R. Civ. P. 12(b)(1)

"It is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it. *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Makarova*, 201 F.3d at 113. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 [2d Cir. 1996]). When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved, and inferences drawn, in favor of the plaintiff. *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Makarova*, 201 F.3d at 113).

### B. Standard Governing Motion to Dismiss for Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6)

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds:

(1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).[101]

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases);

---

[101]     *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (McAvoy, C.J.).

*Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing

Second Circuit cases).  For this reason, as one commentator has correctly observed, the "liberal"

notice pleading standard "has its limits."  2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d

ed. 2003).  For example, numerous Supreme Court and Second Circuit decisions exist holding

that a pleading has failed to meet the "liberal" notice pleading standard.  *Rusyniak,* 629 F. Supp.

2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129

S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an

appellate decision holding that a complaint had stated an actionable antitrust claim under 15

U.S.C. § 1.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  In doing so, the Court

"retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957),

that "a complaint should not be dismissed for failure to state a claim unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

to relief."  *Twombly*, 127 S. Ct. at 1968-69.  Rather than turn on the *conceivability* of an

actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an

actionable claim.  *Id*. at 1965-74.  The Court explained that, while this does not mean that a

pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the

pleading must contain at least "some factual allegation[s]."  *Id*. at 1965.  More specifically, the

"[f]actual allegations must be enough to raise a right to relief above the speculative level [to a

plausible level]," assuming (of course) that all the allegations in the complaint are true.  *Id*.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3)

documents that, although not incorporated by reference, are "integral" to the complaint, or (4)

any matter of which the court can take judicial notice for the factual background of the case.[102]

### C. Standard Governing Motion for Summary Judgment Under Fed. R. Civ. P. 56

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[103] As for the materiality requirement, a dispute of fact is

---

[102] *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, 10-CV-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. . . . Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint. . . . However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

[103] As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine dispute of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

---

omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[104]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[105]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[104]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[105]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

Finally, the Court notes that the "principles governing admissibility of evidence do not change on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).

### D. Standard Governing Plaintiff's Claims and Defendant's Defenses

Because the parties have (in their memoranda of law) demonstrated an accurate understanding of the legal standards governing Plaintiff's claims and Defendant's defenses in this action, the Court will not recite those legal standards in their entirety in this Decision and Order, which is intended primarily for the review of the parties. (*See generally* Dkt. No. 13 [Def.'s Mem. of Law]; Dkt. No. 23 [Plf.'s Opp'n Mem. of Law]; Dkt. No. 26 [Def.'s Reply Mem. of Law].) Instead, the Court will merely focus on certain portions of those standards where necessary below in Part III of this Decision and Order.

## III. ANALYSIS

For ease of analysis, the Court will first address Defendant's motion to dismiss for lack of subject-matter jurisdiction and then address each of Plaintiff's claims (first in light of Defendant's failure-to-state-a-claim arguments against them and then in light of Defendant's summary-judgment arguments asserted against them).

### A. Analysis of Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction Under Fed. R. Civ. P. 12(b)(1)

After carefully considering the matter, the Court denies Defendant's motion to dismiss for lack of subject-matter jurisdiction for the reasons stated in Plaintiff's opposition

memorandum of law.  (Dkt. No. 23 [Plf.'s Opp'n Mem. of Law].)  To those reasons, the Court adds the following analysis.

The FRSA was enacted "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."  49 U.S.C. § 20101.  In 1980, the FRSA was expanded to include amendments that prohibited rail carriers from retaliating against employees who engaged in protected activity, such as reporting safety violations.  *Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 877 (S.D. Iowa 2013) (citing Fed. Railroad Safety Authorization Act of 1980, Pub. L. No. 96-423, § 10, 94 Stat. 1811 [1980]).  "Following the 1980 amendments, employees who experienced such retaliation could seek relief through the arbitration procedures set forth in RLA § 3, 45 U.S.C. § 153."  *Reed v. Norfolk S. Ry. Co.*, 12-CV-0873, 2013 WL 1791694, at *3 (N.D. Ill. Apr. 26, 2013) (citing Fed. Railroad Safety Authorization Act of 1980, Pub. L. No. 96-423, § 10, § 212[c][1], 94 Stat. 1811, 1815 [1980].)

In 2007, Congress "eliminated the requirement that retaliation claims be resolved under the RLA, and instead established an administrative procedure under which retaliation complaints are resolved by OSHA."  *Welch v. Union R.R. Co.*, 16-CV-0431, 2016 WL 4154760, at *2 (W.D. Mo. Aug. 4, 2016) (citing 49 U.S.C. § 20109[d]; *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 630 [4th Cir. 2015]).  "The administrative procedure commences with the filing of a complaint with the DOL."  *Welch*, 2016 WL 4154760, at *2 (citing 49 U.S.C. § 20109[d][1]).  "[I]f the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States . . . ."  49 U.S.C. § 20109(d)(3).  The 2007 amendments also included the following addition: "Nothing in

this section preempts or diminishes any other safeguards against . . . retaliation . . . provided by Federal or State law." 49 U.S.C. § 20109(g).

"A 'typical case' of retaliatory discharge will not 'depend[] upon the meaning of a collective-bargaining agreement.'" *Gilmore v. Union Pac. R.R. Co.*, 09-CV-2180, 2012 WL 3205233, at *4 (E.D. Cal. Aug. 2, 2012) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 [1988]).

However, even after the 2007 amendments to the FRSA, arbitration pursuant to the RLA remains the exclusive remedy where interpretation of the CBA is required to resolve a dispute. *See Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, at 897-98 (D. Minn. 2015) (dismissing four of the plaintiff's claims because "[i]t would . . . be impossible for the Court to adjudicate [plaintiff's] claims without interpreting provisions of the CBA–provisions that, according to [plaintiff], entitled her to these reimbursement[s] and positions and that, according to [defendant], created no such entitlement" and maintaining four of the plaintiff's claims that are independent of the CBA holding that "[t]o resolve these retaliation claims, the Court will primarily address 'purely factual questions' about [plaintiff's] conduct and [defendant's] motivations"); *Dunn v. BNSF Ry. Co.*, 17-CV-0333, 2017 WL 3670559, at *4 (W.D. Wash. Aug. 25, 2017) (ordering the plaintiff to show cause why his alternative handling claim should not be dismissed for lack of subject-matter jurisdiction because it involved a "minor dispute" that required the Court to ascertain whether he was entitled to alternative handling in the first place pursuant to the CBA); *cf. Powell v. Union Pac. R.R. Co.*, 864 F. Supp. 2d 949, 959-60 (E.D. Cal. 2012) (holding that the plaintiff's FRSA wrongful termination claim does not require interpretation of the CBA and thus is not preempted by the RLA); *Ray*, 971 F. Supp. 2d at 880 (holding that the plaintiff's FRSA claims were not precluded by the election of remedies

provision in § 20109[f] where the plaintiff also brought an enforcement action under the RLA for rights that substantively arose under the CBA); *Reed*, 2013 WL 1791694, at *4-5 (quoting 45 U.S.C. § 153[i]) (holding that arbitration under the RLA "is not an 'election' of a remedy" because the arbitration provisions of the RLA are mandatory and only authorize the arbitration tribunal to hear disputes "arising 'out of the interpretation or application of [collective bargaining] agreements concerning rates of pay, rules, or working conditions[.]'"); *Ratledge v. Norfolk S. Ry. Co.*, 12-CV-0402, 2013 WL 3872793, at *12-17 (E.D. Tenn. July 25, 2013) (holding that the purpose of the FRSA would be impeded by interpreting the election-of-remedies provision to extend to the RLA where the plaintiff sought relief from his dismissal pursuant to the provisions of the RLA, because the "2007 amendments [to FRSA], . . . were intended to provide *more* protection to employees. . . . If [defendant's] interpretation were adopted, employees would face a choice between whistleblower protection and seeking review of CBA rights. Forcing an employee into such a choice will result in fewer § 20109 actions, and potentially insulate rail carriers from administrative or judicial review of retaliatory conduct.").

Here, the Court finds that it possesses subject-jurisdiction over Plaintiff's Complaint because Plaintiff's claims are independent of the CBA and thus not subject to mandatory arbitration pursuant the RLA.

"To establish a *prima facie* claim of retaliation under the FRSA, an employee must show by a preponderance of the evidence that he (1) engaged in protected activity as defined by the statute; (2) his employer knew that he had engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017) (citing *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 [2d Cir. 2013]; *Conrad v. CSX*

*Transp., Inc.*, 824 F.3d 103, 107 [4th Cir. 2016]; *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 [3d Cir. 2013]).  If the plaintiff satisfies all of these requirements, "then the burden shifts to the employer to demonstrate by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity."  *Conrad*, 824 F.3d at 107.  "Failure to satisfy any one of the *prima facie* requirements is fatal to a claim."  *Lockhart*, 266 F. Supp. 3d at 663 (citing *Conrad* 824 F.3d at 107).

The Court finds that the only element of the four elements listed above that could involve the need to interpret the terms of the CBA appears to be the element of whether Plaintiff has engaged in protected activity; whether Defendant was aware of protected activity, whether Plaintiff suffered an unfavorable personnel action, and whether the protected activity was a contributing factor in that action all appear to be factual matters outside the scope of the CBA. As Plaintiff alleges in his Complaint, 49 U.S.C. § 20109(b) indicates that a railroad carrier "shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for (A) reporting, in good faith, a hazardous safety or security condition."  49 U.S.C. § 20109(b).  Therefore, protected activity under this section would include the reporting of safety concerns, as long as those reports were made in good faith.

Plaintiff's alleged protected activity included complaints about Defendant's "on-call and scheduling decisions" that allegedly caused security officers to be over-worked and without adequate rest or sleep, which decreased the security officers' ability to perform their jobs effectively and thus created an unsafe condition.  *See, supra,* Part I.B. at ¶ 110 of this Decision and Order.  While Plaintiff asserted at various times (i.e., in his OSHA complaint and during his deposition) that Defendant's on-call, scheduling, and overtime decisions were in violation of the CBA (*see, e.g.,* Dkt. No. 18, Attach. 1, at 6-8), the Court is not required to determine the veracity

of those assertions to resolve Plaintiff's claim for retaliation. More specifically, the Court need not determine whether Defendant's on-call and scheduling practices were in violation of the CBA to answer the question of whether Plaintiff engaged in protected activity when he allegedly raised "safety concerns" regarding Defendant's on-call and scheduling practices. As a result, these questions are independent of one another. *See Crayton v. Long Island R.R.*, 05-CV-1721, 2006 WL 3833114, at *4 (E.D.N.Y. Dec. 29, 2006) (holding that, where a claim "turns on the interpretation of a provision of the CBA," it "is substantially dependent upon an analysis of the terms of a collective bargaining agreement" and thus, precluded by the RLA).

Even the determination of whether Plaintiff's reports of safety concerns were made in good faith would not require interpretation of the CBA because, apart from whether Plaintiff has alleged that Defendant's on-call and other policies violated the terms of the CBA, the relevant question is whether Plaintiff had a good-faith belief that the actual fact of being on-call for extended lengths of time without days off created a hazardous safety or security condition. The Court can assess Plaintiff's belief without having to interpret the terms of the CBA. The fact that the CBA specifically states that union members cannot be required to work in unsafe conditions or otherwise proscribes certain on-call or overtime practices of Defendant does not preclude a finding of subject-matter jurisdiction because Plaintiff does not allege that conditions were unsafe in that they violated the terms set forth in the CBA; rather, Plaintiff alleges conditions were unsafe because the "excessive overtime" and on-call requirement caused fatigue that undermined his ability to perform his job safely. (Dkt. No. 1, at ¶ 9.) Therefore, to the extent that Plaintiff alleges safety concerns beyond mere failure to comply with the standards that the CBA deems to be "safe," Plaintiff's retaliation claims are properly reviewable under the FRSA.

For all of these reasons, the Court denies Defendant's motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).[106]

**B.    Analysis of Plaintiff's Claim of Discriminatory Reprimand**

**1.    Failure-to-State-a-Claim Analysis Under Fed. R. Civ. P. 12(b)(6)**

After carefully considering the matter, the Court denies this aspect of Defendant's motion to dismiss for failure to state a claim for the reasons stated in Plaintiff's memorandum of law. (Dkt. No. 23 [Plf.'s Opp'n Mem. of Law].)  To those reasons, the Court adds the following analysis.

Liberally construed (as all complaints must be under Fed. R. Civ. P. 8[e]), Plaintiff's Complaint plausibly alleges FRSA-protected activity.  More specifically, the Complaint alleges that "[o]n or about March 30, 2016, Plaintiff informed his supervisor, Sgt. Seymour in Detroit Michigan, that he had a safety complaint about the manner in which he was being scheduled to work, including the need to work excessive overtime and being on call without a break, or time off."  (Dkt. No. 1, at ¶ 21.)  Drawing all reasonable inferences in Plaintiff's favor, as the Court must do on a motion to dismiss for failure to state a claim, the Court finds that the Complaint sufficiently alleged that Plaintiff engaged in FRSA-protected activity.

---

[106]    The Court notes that Plaintiff's opposition memorandum of law also asserts a new allegation that "[a]ny evidence regarding any discriminatory basis of the disciplinary charge is strictly excluded from the transcribed record by the hearing officer."  (Dkt. No. 23, at 8.)  To the extent Plaintiff wishes to assert an allegation that Defendant violated the CBA procedure during his disciplinary proceedings, his opposition memorandum of law is an impermissible vehicle by which to assert new factual allegations.  In any event, even if Plaintiff had successfully amended his Complaint to add such an allegation, an interpretation of the CBA would be required to resolve a claim based on that allegation; hence, the Court would lack subject-matter jurisdiction over such a new claim.

### 2.    Summary-Judgment Analysis Under Fed. R. Civ. P. 56

#### a.    Whether Plaintiff Engaged in Good-Faith FRSA-Protected Activity

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memoranda of law.  (Dkt. No. 13 [Def.'s Mem. of Law]; Dkt. No. 26 [Def.'s Reply Mem. of Law].)  To those reasons, the Court adds the following analysis, which is intended to supplement but not supplant Defendant's reasons.

As discussed above, the FRSA forbids a rail carrier from retaliating against an employee who "report[s], in good faith, a hazardous safety or security condition."  49 U.S.C. § 20109(b)(1)(A).  To establish that he engaged in protected activity, a plaintiff must demonstrate that the information he provided concerned conduct that he "reasonably believe[d] constitute[d] a violation of any Federal law, rule, or regulation relating to railroad safety or security, or gross fraud, waste, or abuse of Federal grants or other public funds intended to be used for railroad safety or security."  49 U.S.C. § 20109(a)(1).  "A 'reasonable belief contains both subjective and objective components.'"  *Hernandez v. Metro-N. Commuter R.R.*, 74 F. Supp. 3d 576, 580 (S.D.N.Y. 2015) (quoting *Nielson v. AECOM Tech. Corp.*, 762 F.3d 214, 221 [2d Cir. 2014]) (holding applicable to FRSA the Second Circuit's reasonable belief standard that includes subjective and objective components from whistleblower claims brought pursuant to other statutes).  "A plaintiff must 'show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation.'"  *Hernandez*, 74 F. Supp. 3d at 580 (quoting *Nielsen*, 762 F.3d at 221).  Moreover, the information must be provided to "a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct[.]"  49 U.S.C. § 20109(a)(1)(C).

"Where, as here, the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its summary judgment burden by 'point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim.' To avoid summary judgment, the opposing party 'must [then] show the presence of a genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial.'" *Young v. CSX Transp., Inc.*, 42 F. Supp. 3d 388, 394 (N.D.N.Y. 2014) (Hurd, J.) (quoting *Doona v. OneSource Holdings, Inc.*, 680 F. Supp. 2d 394, 399 [E.D.N.Y. 2010], and *United States v. Rem*, 38 F.3d 634, 643 [2d Cir. 1994]).

The Court notes that much of the evidence before it is inadmissible hearsay that cannot be considered on a motion for summary judgment. For example, both parties submitted "declarations" or "affidavits" that were not signed before a notary public or sworn to pursuant to 28 U.S.C. § 1746. In addition, Plaintiff's Complaint was not verified and his response to Defendant's Interrogatories was signed only by his attorney, who lacked first-hand knowledge of the answers to the interrogatories.

Having said that, based on the admissible evidence before it, the Court agrees with Defendant that Plaintiff is unable to establish that he engaged in protected activity. In his deposition, Plaintiff unequivocally testified that he did not personally have any conversations with supervisors employed by Defendant regarding safety concerns.[107] Instead, Plaintiff testified

---

[107]    Plaintiff provided the following testimony:

Q:    When you say it's a safety concern, can you tell me, specifically you, yourself, when you personally, if ever, told a C.P. manager that?

A:    I told my union rep because they wanted us to follow the chain of command, so.
. . .

Q:    So it would be fair to say that you never–you, Mr. Niedziejko, never personally spoke to one of the C.P. managers directly?

that, beginning sometime in early 2015, the Union filed a grievance (and possibly additional grievances) about scheduling that may or may not have identified Plaintiff by name. (Dkt. No. 18, Attach. 12, at 12.)[108]

---

A:    I–I've spoken to them directly. They–they were under–yeah–

Q:    About–about–about this issue, sorry. Not–not–I know you've talked–

A:    Yeah.

Q:    –with them, I'm sorry, I should be more specific–about this particular issue?

A:    There–they were well aware of the issue.

Q:    Right, but just answer my question, you personally didn't directly speak to them about the issue?

A:    No.

(Dkt. No. 18, Attach. 12, at 14 [attaching pages "50" through "52" of transcript].)

[108]    In addition, Plaintiff testified as follows:

Q:    Okay. Well, here's–here's my question.
      Other–other than that grievance relating to the schedule and on-call, my question is it–other than that, are there any other reports you haven't raised or talked about today, that you claim to have made that you claim consist–or constitute a hazardous safety railroad-security concern, that you brought to C.P.'s management's attention?

A:    The union did.

Q:    It would only be the union?

A:    They want–

Q:    Not you?

A:    –they–they wanted to use the chain of command, so that's how we did it.

Q:    Okay. So, in–to the extent any such reports exist, they come through the union, is what you're saying and your recollection is they are contained in this grievance from early 2015?

A:    I–I don't know.

Q:    Okay. You–you can't speak to any personal reports, you individual and personally made to C.P. management?

A:    No.

(Dkt. No. 18, Attach. 12, at 57-58 [attaching pages "224" and "225" of transcript].)

In addition to Plaintiff's deposition testimony, the parties submitted Plaintiff's OSHA complaint, which he signed under penalty of perjury. (Dkt. No. 18, Attach. 1, at 8.) Plaintiff testified at his deposition regarding the allegations contained in his OSHA complaint. (*See, e.g.,* Dkt. No. 18, Attach. 12, at 59-60 [attaching pages "232" and "233" of transcript].) Regarding his allegation in his OSHA complaint that, "I as well as other union members have notified my Sergeant and Commander numerous times about how it is a safety hazard for lack of staffing of Special Agents that we have, and being s [sic] frequently scheduled to be on call" (Dkt. No. 18, Attach. 1, at 6), Plaintiff clarified that he was, in fact, referring to the Union grievances that were filed in early 2015.[109]

---

[109]     Specifically, Plaintiff testified as follows:

> Q:     And the next paragraph begins with being notified numerous times about a safety hazard, for lack of staffing of special agents being frequently scheduled to be on-call, the incompetence of our call-center, that dispatch has called numerous times.
> Do you see that–the–that first full sentence? It runs about four lines?
> A:     Okay.
> Q:     Is that reference to the notification about this alleged safety hazard? Is that getting at the grievance that you've been referring to, that you say you relied on the union to submit and work the chain of command?
> A:     Yeah. I'm guessing so.
> Q:     Okay. Is there anything else alleged in this statement about any other types of alleged safety reports that you claimed to have raised to C.P. management?
> A:     Whatever's in here.
> Q:     Okay. So, this is a complete and accurate statement from you, as to what, if any hazardous-condition reports you claim to have made?
> A:     Whatever's in that document there.
> Q:     Okay. But I just wanted to be clear on that first paragraph, that we're talking–that it's again, going back to that union grievance, that you direct me to the union, to find more out about, that you can't speak to, directly or personally. That's what I just want to make clear, that it is–there isn't something else.

The Court notes also that neither party has produced any documentation of or testimony from Union representatives regarding the Union grievance that was allegedly filed. Plaintiff does not argue that raising safety concerns to the Union constituted the good-faith protected activity on which he is relying. (Dkt. No. 23.) *See also Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1099 (D. Minn. 2013) (holding that reporting safety concerns to a union representative is not protected activity as defined in FRSA where there is no evidence that the union representative was a supervisor or had authority to investigate, discover or terminate the misconduct), *aff'd on other grounds*, 786 F.3d 786 (8th Cir. 2014).

Instead, Plaintiff asserts that he did, in fact, discuss his safety concerns directly with his supervisors. In support of that argument, Plaintiff points to three separate portions of his deposition testimony regarding conversations that he had with (1) District Inspector Szymaszek, (2) Sergeant Kevin Seymour, and (3) Jim Thomas.[110] The Court notes that Plaintiff's testimony

---

A: Whatever's in the complaints.

(Dkt. No. 18, Attach. 12, at 59-60 [attaching pages "232" and "233" of transcript].)

[110] Plaintiff testified regarding a conversation with District Inspector Szymaszek as follows:

Q: So can you explain to me more specifically how you believe they were violating the contract when it came to scheduling?
A: Whatever the Union rep went with.
They would have us working, like, seventeen days straight with no days off, being on-call for all those times, you know, we brought that to their attention, that it was a safety issue. And they said, you know–
Q: And–
A: –they–they always said, you know, sometimes–I'm like, we can't be on call, you know twenty-one days straight or seventeen days straight and Dennis would say, well sometimes, you know, you guys got to suck it up and, you know, sometimes the company's got to feel the burn. But the only people that felt the burn were the guys being on-call, you know, seventeen days straight.

concerning what Jim Thomas told him is inadmissible hearsay and is not considered by the Court in deciding Plaintiff's motion: what remains regarding that conversation is insufficient to establish that Plaintiff discussed his safety concerns directly with Jim Thomas. Furthermore, Plaintiff's testimony about conversations with District Inspector Szymaszek and Sergeant

---

(Dkt. No. 18, Attach. 12, at 13 [attaching pages "45" and "46" of transcript].)

Plaintiff testified regarding a conversation with Sergeant Kevin Seymour as follows:

> Q:  Okay. Is that the only statement that you claim was made?
> A:  No.  He's also made the statement–he's like I don't know what you guys think you're doing, calling the union on us.  It's not–it's not going to hurt me or Dennis.  It's only going to hurt you guys.  That sounds like a threat to me and that was in Detroit, during firearms training.  And REDACTED was–
> Q:  And–?
> A:  –and REDACTED was present, right there.  Because we were complaining, once again, about the scheduling.  So, we called the union, the union called him.  So–.
> Q:  And when exactly was the date that you're referring to, in Detroit, during firearms training?
> A:  Hang on.  March 28th, through the 31st, we were in Detroit for firearms training.

(Dkt. No. 18, Attach. 12, at 64 [attaching pages "250" and "251" of transcript].)

Plaintiff testified regarding a conversation with Jim Thomas, a claims agent for Defendant as follows:

> A:  . . . The claims' manager was listening in on a conversation over the speaker phone and Dennis called up the superintendent to get the process of how you go about writing people up because we never had anybody written up before.  And then this claims' manager pulled me aside and said hey, Dennis is calling here.  He's looking to fire you guys and write you guys up.  I'm like, are you kidding me.  I'm like, over what? So, and that's–that was during the time the grievances were filed.

(Dkt. No. 18, Attach. 12, at 65 [attaching page "254" of transcript].)

Seymour fail to establish a genuine dispute of material fact for trial regarding whether Plaintiff engaged in protected activity for the following two reasons.

First, Plaintiff's testimony does not reasonably suggest that he raised any safety concern to District Inspector Szymaszek or Sergeant Seymour. (Dkt. No. 18. Attach. 12, at 13, 64.) Instead, the only reasonable interpretation of Plaintiff's testimony regarding the conversation with District Inspector Szymaszek is that, at some point in time and to someone (perhaps not even in Plaintiff's presence) in response to complaints about Defendant's scheduling and on-call practices, District Inspector Szymaszek said something to the effect of "sometimes you guys got to suck it up and sometimes the company's got to feel the burn." (*Id.* at 13.) In addition, the only reasonable interpretation of Plaintiff's testimony regarding the conversation with Sergeant Seymour is that sometime between March 28 and March 31, 2016, in Plaintiff and REDACTION 3's presence, Sergeant Seymour said something to the effect of "calling the union on us is not going to hurt me or Dennis. It is only going to hurt you guys." (*Id.* at 64.)[111] These statements by District Inspector Szymaszek and Sergeant Seymour do not reasonably suggest that any safety concerns specifically were raised by Plaintiff or the Union. Instead, the statements appear to be in response to CBA disputes between the Union and CP management regarding scheduling. *See Gibbs v. Norfolk S. Ry. Co.*, 14-CV-0587, 2018 WL 1542141, at *5 (W.D. Ky. Mar. 29, 2018)

---

[111]    Plaintiff's OSHA complaint also refers to his conversation with Sergeant Seymour stating:

> REDACTION 3 and myself had a conversation with Sgt. Seymour on March 30, 2016, in Det [sic] Michigan about scheduling, overtimes, and other union issues. He told us that he had spoken to REDACTION 4 about our concerns. He stated "it's only going to hurt you guys an [sic] not me or Dennis."

(Dkt. No. 18, Attach. 1, at 7.)

(holding that an e-mail that did not contain any concerns about safety and instead described an inconvenience was not FRSA protected activity).

Second, this incomplete testimony is insufficient to defeat a summary judgment motion because Plaintiff also testified that the only safety complaints he made were to the Union and that he did not make any safety complaints to Defendant's management. (Dkt. No. 18, Attach. 12, at 57-58.) *See also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account."). Even drawing all inferences in the light most favorable to Plaintiff, the Court finds that no reasonable person could believe that Plaintiff engaged in good-faith protected activity by (allegedly) making safety complaints to District Inspector Szymaszek or Sergeant Seymour.

Moreover, the Court notes that Plaintiff did not dispute Defendant's argument that his OSHA complaint did not constitute good-faith protected activity. (*Compare* Dkt. No. 13, at 10-14 [attaching pages "8" through "12" of Def.'s Memo. of Law] *with* Dkt. No. 23 [Plf.'s Opp'n Memo. of Law].) As set forth above in Part II.C. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been

characterized as a "modest" burden.  N.D.N.Y. L.R. 7.1(b)(3).[112]  Here, Defendant has shown

that its argument that Plaintiff's OSHA complaint did not constitute protected activity possesses

facial merit for the reasons stated in its motion papers.

For all of these reasons, the Court grants Defendant's motion for summary judgment with

regard to Plaintiff's discriminatory reprimand claim because Plaintiff failed to establish a

genuine dispute of material fact that he engaged in protected activity under FRSA.

### b.     Whether any Decision-Maker(s) Knew of the Protected Activity

In the alternative, after carefully considering the matter, the Court answers this question

in the negative for the reasons stated in Defendant's memoranda of law.  (Dkt. No. 13 [Def.'s

Mem. of Law]; Dkt. No. 26 [Def.'s Reply Mem. of Law].)  To those reasons, the Court adds the

following analysis, which is intended to supplement but not supplant Defendant's reasons.

"[A]t least one person involved in the adverse employment decision must have

knowledge of the protected activity, even if it is an advisor or [member of] upper management."

*Conrad v. CSX Transp., Inc.*, 13-CV-3730, 2014 WL 7184747, at *4 (D. Md. Dec. 15, 2014).

The plaintiff "need not prove that the decision-maker responsible for the adverse action knew of

the protected activity if it can be established that those advising the decision-maker knew,

---

[112]     Alternatively, the Court can, and does, deem the challenged claims abandoned (regardless of the facial merit of the unresponded-to argument).  *See Jackson v. Fed. Exp.*, 776 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made-i.e. referencing some claims or defenses but not others-a distinction between *pro se* and counseled responses is appropriate.  In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate.  In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.  In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review.  This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

regardless of their motives." *Rudolph v. Nat'l R.R. Passenger Corp.*, ARB Case No. 11-037, 2013 WL 1385560, at *12 (Dep't of Labor Mar. 29, 2013).

In *Conrad v. CSX Transp., Inc.*, a district court held that there was not a genuine dispute of material fact as to the knowledge element where the evidence established that the plaintiff provided educational materials to other union members about their rights, advocated for the rights of other union members, and was generally a "thorn in the side" of the defendant's management, but there was no evidence that the plaintiff's supervisors knew that he had engaged in FRSA-protected activity. *Conrad*, 2014 WL 7184747, at *4-5.

Plaintiff argues that, because District Inspector Szymaszek (who was aware of the Union grievance) initiated a disciplinary charge against him and testified at the disciplinary proceeding, the decision to reprimand Plaintiff was influenced by him, and thus Defendant should be found to have such knowledge.

"Courts have accepted this so-called "cat's-paw" theory under certain circumstances."[113] *Gibbs v. Norfolk S. Ry. Co.*, 14-CV-0587, 2018 WL 1542141, at *6 (W.D. Ky. Mar. 29, 2018). Generally, these circumstances involve the supervisor advising the decision-maker or being intimately involved in the decision. *See, e.g., Lowery v. CSX Transp., Inc.*, 690 F. App'x 98, 100 (4th Cir. 2017) (accepting cat's-paw theory where the supervisor "advised" all three decision-makers as to whether the plaintiff had committed a rules violation); *Johnston v. BNSF Ry. Co.*, 15-CV-3685, 2017 WL 4685012, at *8 (D. Minn. Oct. 16, 2017) (accepting cat's-paw theory

---

[113] "The term 'cat's paw' derives from a fable conceived by Aesop . . . . In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). The term was injected into employment-discrimination law in 1990, *see Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990), and into the FRSA context in 2014, *see Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 338 (6th Cir. 2014).

where the supervisors were "intimately involved" in the adverse decision rather than "trivial participants").

Here, District Inspector Szymaszek testified at his deposition that he was not involved in determining the discipline that was imposed on Plaintiff, and that he does not know who was involved in making that decision. (Dkt. No. 18, Attach. 29, at 22, 27, 40 [attaching pages "21," "26" and "39" of transcript].)[114] Plaintiff has not adduced admissible record evidence

---

[114]      For example, District Inspector Szymaszek testified as follows:

> Q:     In terms of the shotgun incident that led to charges against Mr. Niedziejko, were you involved in determining the ultimate discipline that was assessed in that matter?
> A:     No.
> Q:     Who was?
>      . . .
> A:     I don't know who was involved in determining it. I know I was copied on a letter regarding the discipline but I don't know who was involved in determining.

(Dkt. No. 18, Attach. 29, at 22 [attaching page "21" of transcript].)

> Q:     Did you consider an informal counseling for Mr. Niedziejko over that event?
> A:     I believe that was discussed with the Inspector of Personnel and Training.
> Q:     Did he ask you for your input on that?
> A:     I believe he asked for information and I believe that a write-up was submitted.
> Q:     Okay. But did he ask you for your input as to whether [or] what the discipline should be?
> A:     No.

(*Id*. at 27 [attaching page "26" of transcript].)

> Q:     At any point did you advocate that Mr. Niedziejko should not be terminated from his position to any persons?
>
> A:     I didn't have any conversations with anybody regarding what the discipline should be that I recall.

establishing that District Inspector Szymaszek directed or advised that he be reprimanded (or that District Inspector Szymaszek was even the main instigator of the charges). Instead, District Inspector Szymaszek merely submitted a written summary of his field investigation of the incident of June 9-10, 2016, and provided oral statements at the CBA disciplinary hearing. . *See, e.g., supra,* Part I.B., ¶¶ 99-100 of this Decision and Order. This is insufficient. *See, e.g., Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 970 (8th Cir. 2017) (rejecting cat's-paw theory where the supervisor merely informed his supervisor of the plaintiff's alleged rules violation and arranged for witness interviews); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 790-91 (8th Cir. 2014) (rejecting cat's-paw theory where the supervisor merely participated as a witness at the hearing that led to the plaintiff's discharge and there was "no evidence [that the supervisor] advised the decision-makers . . . [or] influenced their discharge decision").

In addition, although Plaintiff does not argue that Sergeant Seymour was a decision-maker with knowledge of his FRSA-protected activity, the Court finds that Plaintiff has not adduced admissible record evidence establishing that Sergeant Seymour directed or advised that Plaintiff be reprimanded.[115]

---

(*Id*. at 40 [attaching page "39" of transcript].)

[115] Rather, Sergeant Seymour testified as follows:

> Q:    In terms of your time as a supervisor at Albany, . . . how many times have you brought charges against one of the people that worked under you in terms of they're not following the rules not, you know, acting appropriately or for any reasons?
> . . .
> A:    I never personally brought charges against anybody. I was involved in one hearing as a witness.
> Q:    So in terms of the disciplinary charges that were brought against Mr. Niedziejko you weren't involved in raising any of those charges?
> . . .

For all of these reasons, the Court grants Defendant's motion for summary judgment with

regard to Plaintiff's discriminatory reprimand claim on the alternative basis that Plaintiff has

---

<blockquote>

A:    I was not involved in raising or bringing charges, no.

. . .

Q:    Okay. The question is: Were you involved in raising any disciplinary charges under the Collective Bargaining Agreement that led to Mr. Niedziejko's termination.

A:    I was a witness in–not in the–no. I was witness in the one hearing involving shotgun logs.

Q:    At any point from the time you became a supervisor up until the time Mr. Niedziejko was terminated did anyone at C.P. Rail other than attorneys, . . . did anyone ever ask you your opinion on whether Mr. Niedziejko should be terminated or dismissed?

A:    No.

Q:    At any time from the time that Mr. Niedziejko was initially charged with any disciplinary violations over the Collective Bargaining Agreement up until the time he was terminated, at any point did you request that the termination be rescinded or that he be charged with something less than termination?

A:    No.

</blockquote>

(Dkt. No. 18, Attach. 28, at 11-13 [attaching pages "10" through "12" of transcript].)

<blockquote>

Q:    Okay. Now there was a hearing for the shotgun logs, are you familiar with that?

A:    Yes.

Q:    Were you involved in that hearing at all?

A:    I was a witness.

</blockquote>

(*Id.* at 31 [attaching page "30" of transcript].)

<blockquote>

Q:    Do you know why Mr. Niedziejko was charged with a disciplinary infraction regarding the shotgun logs?

A:    I, I have a general knowledge but I wasn't part of that decision.

</blockquote>

(*Id.* at 34-35 [attaching pages "33" and "34" of transcript].)

<blockquote>

Q:    Other than what's in the transcript hearing which I have and I've reviewed, did anyone that you're aware of advocate that Mr. Niedziejko not be terminated from his position?

. . .

A:    Not that I'm aware of.

</blockquote>

(*Id.* at 45-46 [attaching pages "44" and "45" of transcript].)

failed to establish a genuine dispute of material fact that the decision-makers who issued the reprimand had knowledge of his protected activity.

### c. Whether the FRSA-Protected Activity Was a Contributing Factor in Defendant's Reprimand Decision

In the alternative, after carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memoranda of law. (Dkt. No. 13 [Def.'s Mem. of Law]; Dkt. No. 26 [Def.'s Reply Mem. of Law].) To those reasons, the Court adds the following analysis, which is intended to supplement but not supplant Defendant's reasons.

A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Araujo v. New Jersey Transit Rail Op., Inc.,* 708 F.3d 152, 158 (3d Cir. 2013) (quoting *Marano v. Dep't of Justice,* 2 F.3d 1137, 1140 [Fed. Cir. 1993]); *Cyrus v. Union Pac. R.R. Co.*, 12-CV-10248, 2015 WL 5675073, at *11 (N.D. Ill. Sept. 24, 2015); *Kuduk*, 768 F.3d at 791 (quoting Procedures for the Handling of Retaliation Complaints Under the Federal Railroad Safety Act, 75 Fed. Reg. 53522-01, 2010 WL 3392070, at *53524 [Aug. 31, 2010]).

While the Second Circuit has not yet addressed this factor, other courts in this Circuit and other circuits have. "Notably, under the statute's 'contributing factor' causation standard, a *prima facie* case does not generally require proof of the employer's retaliatory motive." *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017), *appeal filed* No. 17-2725 (2d Cir. Aug. 31, 2017) (citing *Kuduk*, 768 F.3d at 791, and *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 [9th Cir. 2010]). "But the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." *Kuduk*, 768 F.3d at 791 (citing *Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 338-39 [6th Cir. 2014]; *Ameristar Airways, Inc. v. U.S. Dep't of Labor*, 650 F.3d 562, 569-70 [5th Cir. 2011]).

"The essence of this intentional tort is 'discriminatory animus.'" *Id.* (citing *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1193 [2011]).

A plaintiff can establish a *prima facie* case that his protected activity was a contributing factor in the adverse action by direct or circumstantial evidence. *See Araujo*, 708 F.3d at 161 (holding that direct evidence is not required to establish this element). Circumstantial evidence that may indicate a link between the protected activity and the allegedly adverse actions include "[1] temporal proximity, [2] indications of pretext, [3] inconsistent application of an employer's policies, [4] an employer's shifting explanations for its actions, [5] antagonism or hostility toward a complainant's protected activity, [6] the falsity of an employer's explanation for the adverse action taken, and a [7] change in the employer's attitude toward the complaint after he or she engages in protected activity." *Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 885 (D. Iowa 2013).

Here, a thorough analysis of the relevant factors reveals that Plaintiff has failed to create a genuine dispute of material fact for trial that he was reprimanded because he engaged in protected activity.

### i. Temporal Proximity

Plaintiff testified that the Union grievance was filed in early 2015; however, the disciplinary charges were not filed until June 17, 2016, and Plaintiff was not issued the reprimand until September 9, 2016. (Dkt. No. 18, Attach. 12, at 12, 38-39; Dkt. No. 18, Attach. 19, at 2, 138.) The Court finds that the approximately fifteen- to eighteen-month gap between the alleged protected activity (early 2015) and the adverse action is too attenuated to raise an inference of discriminatory animus or retaliatory intent. *See Doner-Hendrick v. New York Inst. of Tech.*, 874 F. Supp. 2d 227, 242 (S.D.N.Y. 2012) (collecting cases) ("Courts in this Circuit

have held that periods 'of two months or more defeat an inference of causation.'"); *Kuduk*, 980 F. Supp. 2d at 1101 ("[A] plaintiff cannot establish a *prima facie* case of retaliation based on temporal proximity alone when the termination occurred two months after the alleged protected conduct."), *aff'd* 768 F.3d 786 (8th Cir. 2014) ("[W]e reject the notion . . . that temporal proximity, without more, is sufficient to establish a prima facie case."); *Cyrus*, 2015 WL 5675073, at *11 (holding that "[g]iven the attenuated nature of the temporal gaps, no reasonable jury could infer that [plaintiff] was placed on a [developmental action plan] and terminated based on his complaint" where there was a two- to five-month period between the plaintiff's complaint and the developmental action plan, and a five- to nine-month period between the complaint and termination); *King v. Indiana Harbor Belt R.R.*, 15-CV-0245, 2018 WL 5982134, at *9 (N.D. Ind. Nov. 13, 2018) ("the Court agrees that temporal proximity alone cannot create an inference of retaliatory animus here.").

Similarly, Plaintiff asserts that his conversations with District Inspector Szymaszek and Sergeant Seymour took place in March 2016. (Dkt. No. 23, at 10.) Approximately three months elapsed between these conversations and when Plaintiff was charged with the shotgun log violation; and approximately six months elapsed between these conversations and when Plaintiff was actually reprimanded. Again, this time gap is too attenuated to raise an inference of discriminatory animus or retaliatory intent.

### ii. Indications of Pretext

Plaintiff argues that the reprimand he received for violating the shotgun log policy was a pretext for his safety complaints about his work schedule. (Dkt. No. 23, at 22.) However, Defendant presented evidence that the shotgun log policy audit conducted in June 2016, was not the first shotgun log policy audit. In fact, a shotgun log policy audit had been conducted as

recently as 2013.  (Dkt. No. 17, Attach. 6.)  In addition, it is undisputed that the audit of June

2016 was conducted not only in the Albany detachment (where Plaintiff was employed) but in all

detachments in the United States and Canada.  *See, supra,* Part I.B., ¶¶ 57-59 of this Decision

and Order.  Even drawing all reasonable inferences in Plaintiff's favor, a reasonable fact finder

could not conclude that Defendant conducted a periodic nationwide audit of shotgun logs simply

to target Plaintiff for his complaints.

### iii.    Inconsistent Application of Policies

Plaintiff argues that Defendant's disciplinary charges against him were based on his

safety report, but the other Special Agents in the Albany Detachment were not charged with a

shotgun log policy violation despite also being members of the Union, which allegedly filed a

safety complaint on their behalf, and also not filling out a shotgun log.  (Dkt. No. 18, Attach. 1,

at 7; Dkt. No. 18, Attach. 28, at 31-32, 34.) *See also Pollock v. Union Pacific R.R. Co.,* 12-CV-

2128, 2014 WL 3696116, at * 3 (S.D. Cal. July 23, 2014) (granting summary judgment for the

defendant where the plaintiff and another employee ["Brooks"] were disciplined after plaintiff

engaged in protected activity but Brooks did not engage in protected activity).

In addition, the Court finds that Sergeant Seymour, who was required to (but did not)

review the shotgun logs on a monthly basis, but was not formally reprimanded for his violation

of the policy, is not similarly situated to Plaintiff.  *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962,

970 (8th Cir. 2017) (citing *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 957 [8th Cir. 2012]).

During the relevant time period, Sergeant Seymour was a non-union manager, whose terms and

conditions of employment were not governed by the same CBA as Plaintiff's.  (Dkt. No. 17, at

¶¶ 4-5; Dkt. No. 18, Attach. 28, at 7-9.)

### iv. Remaining Types of Circumstantial Evidence

After carefully reviewing the record, the Court can find no admissible evidence of any shifting explanations for Defendant's actions, any antagonism or hostility toward Plaintiff's protected activity, any falsity of Defendant's explanation for the adverse action taken, and any change in Defendant's attitude toward Plaintiff after he engaged in protected activity.

For all of these reasons the Court grants Defendant's motion for summary judgment with regard to Plaintiff's discriminatory reprimand claim based on the alternative finding that Plaintiff has failed to establish a genuine dispute of material fact that his protected activity was a contributing factor in Defendant's decision to reprimand him.

### C. Analysis of Plaintiff's Claim of Discriminatory Termination

#### 1. Failure-to-State-a-Claim Analysis Under Fed. R. Civ. P. 12(b)(6)

As set forth above in Part III.A.1 of this Decision and Order, the Court finds that Plaintiff's Complaint sufficiently alleges that he engaged in FRSA-protected activity. Therefore, the Court denies this aspect of Defendant's motion to dismiss for failure to state a claim.

#### 2. Summary-Judgment Analysis Under Fed. R. Civ. P. 56

##### a. Whether Plaintiff Engaged in Good-Faith FRSA-Protected Activity

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memoranda of law. (Dkt. No. 13 [Def.'s Mem. of Law]; Dkt. No. 26 [Def.'s Reply Mem. of Law].) To those reasons, the Court adds one point, which is intended to supplement but not supplant Defendant's reasons: as set forth above in Part III.A.2.a. of this Decision and Order, the Court finds that Plaintiff has failed to establish a genuine dispute of material fact that he engaged in good-faith FRSA-protected activity. Therefore, to the extent

that Defendant moves for summary judgment with regard to Plaintiff's discriminatory termination claim, that motion is granted.

### b. Whether any Decision-Maker(s) Knew of the Protected Activity

In the alternative, after carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memoranda of law. (Dkt. No. 13 [Def.'s Mem. of Law]; Dkt. No. 26 [Def.'s Reply Mem. of Law].) To those reasons, the Court adds one point, which is intended to supplement but not supplant Defendant's reasons: as set forth above in Part III.A.2.b. of this Decision and Order, the Court finds that Plaintiff has failed to establish a genuine dispute of material fact that the decision-makers in his termination had knowledge of, or were advised by individuals who knew of, Plaintiff's FRSA-protected activity.

For all of these reasons, Defendant's motion for summary judgment with regard to Plaintiff's discriminatory termination claim is granted.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion to dismiss or, in the alternative, for summary judgment (Dkt. No. 13) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court shall close this action.

Dated: March 27, 2019
      Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge